## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

```
------------------------------------------------------------x
                                          )
SIERRA CLUB, INC. and CONSERVATION        )     Case No. _____
    LAW FOUNDATION, INC.,                 )
                                          )     COMPLAINT FOR
               Plaintiffs,                )     DECLARATORY AND
                                          )     INJUNCTIVE RELIEF AND
        v.                                )     CIVIL PENALTIES
                                          )
GRANITE SHORE POWER LLC; GSP              )     (Federal Water Pollution Control
MERRIMACK LLC; and PUBLIC SERVICE         )     Act, 33 U.S.C. §§ 1251 to 1387)
COMPANY OF NEW HAMPSHIRE d/b/a            )
EVERSOURCE ENERGY,                        )
                                          )
               Defendants.                )
                                          )
------------------------------------------------------------x
```

Plaintiffs Sierra Club Inc. and Conservation Law Foundation, Inc., by and through their

counsel, hereby allege:

### I.

### INTRODUCTION

1.      This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act," "the

Act," or "CWA") to address and abate ongoing and continuous violations of the Act by Granite

Shore Power LLC, GSP Merrimack LLC, and Public Service Company of New Hampshire d/b/a

Eversource Energy ("Defendants") as the owners and operators of the Merrimack Station, a

power plant on the banks of the Merrimack River in Bow, New Hampshire.

2.      The Merrimack Station (the "Station") is one of New England's oldest and most

polluting power plants.  The Station is located on approximately 230 acres of land in Bow, New

Hampshire. The Station sits on the western bank of the Merrimack River in the middle of a 5.8-mile stretch known as the Hooksett Pool. The Hooksett Pool is a relatively shallow part of the river, ranging in depth from six to ten feet, bounded by the upstream Garvin's Falls Dam and the downstream Hooksett Dam.

3.     Power plants like the Station, that utilize "once-through" cooling systems, are capable of heating large volumes of water to very high temperatures. These facilities withdraw water from a water body, dump waste heat into it, and then discharge the heated water (or "thermal effluent") to a receiving water body. These heated discharges can have a significant effect on the temperature of the receiving water, which in turn can cause great ecological harm.

4.     For decades, the Station has drawn about 287 million gallons per day (design flow) of cooling water from the Merrimack River and has discharged a similar quantity of thermal effluent back into the river, causing significant ecological harm to the river. The Station also kills, maims, or otherwise harms fish, fish larvae, and other aquatic organisms that become trapped on the plant's intake screens, or are pulled into the existing once-through cooling system.

5.     The Sierra Club, Inc. and Conservation Law Foundation, Inc. ("CLF") (collectively "Plaintiffs") bring this citizen suit against Defendants because the Station has for decades discharged heated wastewater in a manner that is deleterious to the environmental and ecological health of the Merrimack River, and not in compliance with the National Pollutant Discharge Elimination System ("NPDES") permit for the Station (Permit NH0001465) (the

2

"NPDES Permit"), which went into effect in 1992,[1] and section 301(a) and section 402 of the CWA. *See* 33 U.S.C. §§ 1311(a), 1342.

## II.

### JURISDICTION AND VENUE

6.        This Court has subject matter jurisdiction over this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

7.        Plaintiff has complied with the notice requirements under section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1).

8.        On November 1, 2018, Plaintiffs provided notice of Defendants' violations of the Act, and of their intention to file suit against Defendants, to: Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); and the Administrator of EPA Region I, as required by the Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3. A true and correct copy of Plaintiffs' notice letter is attached as Exhibit B and is incorporated by reference, including all the allegations therein.

9.        On December 21, 2018, Plaintiffs provided notice of Defendants' violations of the Act and of their intention to file suit against Defendants to the commissioner of the New Hampshire Department of Environmental Services, who is the chief administrative officer of the water pollution control agency for the State of New Hampshire, where the violations alleged in this complaint are occurring. *See* December 21, 2018 letter to New Hampshire Department of

---

[1] Authorization to Discharge Under the National Pollutant Discharge Elimination System, Merrimack Station (Permit No. NH0001465) (June 25, 1992). A true and correct copy of the NPDES Permit is attached as Exhibit A and is incorporated by reference.

3

Environmental Services in Exhibit B.

10.     More than sixty days have passed since the notice letter was served on Defendants, the State of New Hampshire, and the EPA.

11.     Neither the United States nor the state has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

12.     This action is not barred by any prior administrative penalty under section 309(g) of the Act, 33 U.S.C. § 1319(g).

13.     Venue is proper in the District of New Hampshire pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

14.     Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grass-roots environmental organization. The Sierra Club is a national nonprofit organization that is incorporated in California and has its headquarters in Oakland, California. It has more than eight hundred thousand members, including thousands of members in New Hampshire. The Sierra Club is dedicated to the protection and preservation of the natural and human environment, including protecting threatened and endangered species and their habitat. The Sierra Club's purpose is to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystem and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

4

15.     Plaintiff Conservation Law Foundation ("CLF") was founded in 1966 and is New England's oldest region-wide environmental advocacy organization. CLF is a nonprofit, member-supported organization with offices in Boston, Massachusetts; Concord, New Hampshire; Montpelier, Vermont; Portland, Maine; and Providence, Rhode Island, and uses the law, science, and the market to protect New England's environment for the benefit of all people. CLF has approximately 5,000 members, including over 500 members in New Hampshire. It has a long history of working to protect the health of New England's and New Hampshire's water resources.

16.     Sierra Club's and CLF's members use, recreate upon, and enjoy the Merrimack River, which Defendants continue to unlawfully pollute. Sierra Club's and CLF's members care very deeply about water quality in the Merrimack River, and water quality in the Merrimack River directly affects the health, recreational, aesthetic, commercial, and environmental interests of the Plaintiffs' members. The interests of Plaintiffs are being, and will be, adversely affected by Defendants' failure to comply with the requirements of the Clean Water Act.

17.     The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy or adequate remedy at law.

18.     Plaintiffs are informed and believe, and thereupon allege, that Defendant Granite Shore Power LLC is a limited liability company formed under the laws of the State of Delaware, which owns and operates the Station in Bow, New Hampshire.

19.     Plaintiffs are informed and believe, and thereupon allege, that Defendant GSP Merrimack LLC is a limited liability company formed under the laws of the State of Delaware,

which owns and operates the Station in Bow, New Hampshire.

20.     Plaintiffs are informed and believe, and thereupon allege, that Defendant Public Service Company of New Hampshire d/b/a Eversource Energy is a corporation incorporated under the laws of the State of New Hampshire, which owned and operated the Station in Bow, New Hampshire until about January 10, 2018.

### IV.

### STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

21.     Congress passed the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA's goal is to eliminate all discharges of pollution into navigable waters. To that end, the CWA prohibits point sources from discharging pollutants into waters of the United States, except in compliance with a NPDES permit. *See* 33 U.S.C. §§ 1311(a), 1342(a).

22.     Heat is defined as a pollutant under the Clean Water Act. *See* 33 U.S.C. § 1362(6).

23.     NPDES permit limits for thermal discharges must, at a minimum, satisfy federal technology-based requirements, as well as any more stringent requirements based on applicable state water quality standards. *See* 33 U.S.C. §§ 1311(b)(1)(C), 1311(b)(2)(A), 1312, 1342(a).

24.     Section 316(a) of the CWA provides that EPA may, under certain circumstances, approve alternative thermal discharge limitations, which vary from the requirements cited above. Section 316(a) authorizes the permitting agency to impose less stringent thermal discharge limits if the permittee can demonstrate that "any effluent limitation proposed for the control of the thermal component of any discharges . . . will require effluent limitations more stringent than

6

necessary to assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife." 33 U.S.C. § 1326(a); 40 C.F.R. § 125.70.

## The Station's NPDES Permit

25.     The Station's NPDES permit, which EPA issued in 1992, includes alternative thermal discharge limitations under section 316(a) that permit the Station to operate without complying with numeric effluent limitations on thermal discharges that satisfy federal technology-based requirements.

26.     Instead, the NPDES Permit specifies that discharges shall not violate any applicable water quality standards, which includes those promulgated by the State of New Hampshire. *See* NPDES Permit, Exhibit A, at I.A.1.b (p. 2).

27.     The NPDES Permit also requires compliance with the following effluent limitations:

> The combined thermal plumes for the station shall; (a) not block the zone of fish passage, (b) not change the balanced indigenous population of the receiving water, and (c) have minimal contact with the surrounding shorelines.

NPDES Permit at Part I.A.1.g (p. 3).

28.     Further, the NPDES Permit requires continuous monitoring of temperature and dissolved oxygen. *See* NPDES Permit at I.A.11.a. (p. 16) & 12.a, b (p. 17).

29.     With respect to temperature, the NPDES permit requires that:

> Continuous river surface temperature monitoring in the vicinity of the Merrimack Generating Station shall be conducted on the following basis. Open-river surface water temperatures will be continuously monitored at control Station N-10, effluent discharge station Zero, and mixing zone Station S-4 . . . . The discharge Station Zero temperature monitoring probe will remain in place and in operation year round.

NPDES Permit at Part I.A11.a (p. 16).

30.     With respect to dissolved oxygen, the NPDES permit requires continuous

7

monitoring: "[t]he permittee shall continuously monitor the dissolved oxygen content of both an ambient river control station and the circulating water discharge. . . ." NPDES Permit at Part I.A.12.b (p. 17).

31.    The NPDES Permit requires that all monitoring data be submitted annually to the EPA regional administrator, as well as other federal and state agencies: "All biological and hydrological monitoring program data shall be submitted to the NHDES, NHF&GD, USF&WS, and the Regional Administrator by December 31 of the following year." NPDES Permit at Part I.A.13 (p. 17).

## New Hampshire State Water Quality Standards

32.    The NPDES permit provides that the Station's discharges "shall not jeopardize any Class B use of the Merrimack River and shall not violate applicable water quality standards." NPDES Permit at Part I.A.1.b (p. 2).

33.    For Class B waters, New Hampshire state law dictates that: "[t]here shall be no disposal of sewage or waste into said waters . . . [where] such disposal of sewage or waste [would] be inimical to aquatic life or to the maintenance of aquatic life in said receiving waters . . . ." N.H. Rev. Stat. Ann. § 485-A:8(II).

34.    In addition, "[a]ny stream temperature increase associated with the discharge of treated sewage, waste or cooling water . . . shall not be such as to appreciably interfere with the uses assigned to this class. The waters of this classification shall be considered as being acceptable for fishing, swimming and other recreational purposes and, after adequate treatment, for use as water supplies." *Id.*

35.    More generally, the New Hampshire water quality regulations mandate that: "[a]ll surface waters shall provide, wherever attainable, for the protection and propagation of fish,

8

shellfish and wildlife, and for recreation in and on the surface waters." N.H. Code R. Env-Wq §

1703.01(c).

36.    The regulations also dictate that: "[a]ll surface waters shall be restored to meet the

water quality criteria for their designated classification including existing and designated uses,

and to maintain the chemical, physical, and biological integrity of surface waters." *Id.* §

1703.01(b).

37.    The "biological integrity" of surface waters means:

the ability of an aquatic ecosystem to support and maintain a balanced, integrated,
adaptive community of organisms having a species composition, diversity, and
functional organization comparable to that of similar natural habitats of a region.

*Id.* § 1702.08.

38.    New Hampshire water quality standard regulations specify a water quality

criterion for "Biological and Aquatic Community Integrity:"

(a) The surface waters shall support and maintain a balanced, integrated, and
adaptive community of organisms having a species composition, diversity, and
functional organization comparable to that of similar natural habitats of a region.

(b) Differences from naturally occurring conditions shall be limited to non-
detrimental differences in community structure and function.

*Id.* § 1703.19(a), (b).

39.    In sum, New Hampshire's narrative water quality standards mean that pollutant

discharges to a Class B water body, such as the Hooksett Pool, may not harm aquatic life (*i.e.*,

"jeopardize," "be inimical to," or contribute to "detrimental differences" from naturally

occurring conditions) or undermine a water body's ability to support and maintain what would

otherwise be the natural, balanced community of aquatic life in that water body with a species

composition, diversity, and functional organization comparable to that of similar natural habitats

of the region.

9

40.     Additionally, the Station's thermal discharges must not result in in-stream temperatures that "appreciably interfere" with fishing or other Class B uses in the Hooksett Pool.

41.     Finally, New Hampshire has a numeric water quality standard for dissolved oxygen which requires in Class B waters, such as the Merrimack River, an average dissolved oxygen concentration that is 75% of the saturation concentration, and an instantaneous standard of 5.0 mg/L or greater at all times. *See* N.H. Code R. Env-Wq § 1703.07(b).

### CWA Citizen Enforcement Suits

42.     Under section 505(a)(1) of the CWA, any citizen may commence a civil action in federal court on his or her own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA. 33 U.S.C. § 1365(a)(1).

43.     The "effluent standard[s] or limitation[s]" that can be enforced in a citizen suit include any "permit or a permit condition issued under section 402" of the CWA. CWA § 505(f), 33 U.S.C. § 1365(f)(7).

44.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

45.     Injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a).

46.     Violators of the Act are also subject to civil penalties of up to $53,484 per day, per violation. *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

47.     Under the CWA, a prevailing or substantially prevailing party may be awarded litigation costs including reasonable attorney and expert witness fees. *See* 33 U.S.C. § 1365(d).

## V.

## FACTS

48.    The Station sits on the western bank of the Merrimack River, in the middle of a 5.8-mile stretch of the river referred to as the Hooksett Pool.

49.    The Hooksett Pool is a shallow part of the river, ranging in depth from six to ten feet, bounded by the upstream Garvin's Falls Dam and the downstream Hooksett Dam.

50.    The Station discharges thermal effluent through a discharge canal into the Hooksett Pool at temperatures above natural ambient levels.

51.    The Station's thermal discharges frequently reach temperatures in excess of 90° Fahrenheit at downstream monitoring points, well in excess of what is tolerable for native species.

52.    Due to the relatively shallow depths in the Hooksett Pool, the thermal plume can extend far and wide, with elevated water temperatures observed at the Hooksett Dam nearly three miles downstream.

53.    The thermal plume is most expansive in the warmer months when, during low-flow conditions, the Station may divert up to sixty-two percent of the Merrimack River flow to cool the Station.

54.    High spring and summer temperatures in the Hooksett Pool surpass important survival thresholds for native fish species, including American Shad and Yellow Perch, as well as for native freshwater mussels.

55.    Under such conditions the thermal plume blocks the zone of passage for these and other fish species in the river.

56.     Temperature data from summer months show completely-mixed lower Hooksett Pool waters can be 3.6 ° to 7.2° Fahrenheit warmer, and at times more than 10 ° Fahrenheit warmer, than upstream waters.

57.     Elevated water temperatures in the entire lower reach of the Hooksett Pool show that there is a shoreline-to-shoreline heat plume.

58.     During summer months thermal discharges from the Station cause stratification of the water and consequent low dissolved oxygen in the underlying strata.

59.     In the cooler months, warm temperatures in the Station's discharges harm native fish species by negatively affecting development and reproduction.

60.     Further, the Station's abrupt shutdowns in the colder seasons cause "cold shocks," *i.e.*, a relatively rapid reduction in water temperatures, which can lead to the physiological impairment or death of fish in the river.

61.      The Station's operations have contributed to a nearly 95 percent decline in resident fish species in the Hooksett Pool, while allowing for certain harmful, non-native, heat tolerant species to upset the ecological balance in the river.

62.     The decline in native fish species, coupled with the presence of a strong population of non-native Asian clams in the area affected by the thermal plume further demonstrates that the plume is changing the balanced indigenous population in the Hooksett Pool by creating species composition, diversity, and functional organization that is not comparable to that of similar natural habitats in the region.

63.     EPA has found that "the evidence as a whole indicates that Merrimack Station's thermal discharge has caused, or contributed to, appreciable harm to Hooksett Pool's balanced, indigenous population of fish." *See* EPA - New England Clean Water Act NPDES Permitting

12

Determinations for the Thermal Discharge and Cooling Water Intake Structures at Merrimack
Station in Bow, New Hampshire NPDES Permit No. NH 0001465 at viii and 121, *available at*
https://www3.epa.gov/region1/npdes/merrimackstation/pdfs/MerrimackStationAttachD.pdf.

64.     EPA has also found that the Station's thermal discharges do not satisfy New
Hampshire water quality standards and have "indeed been inimical to aquatic life in the Hooksett
Pool." *Id.* at 178.

65.     Since the NDPES Permit went into effect, the Station has not submitted
continuous thermal monitoring or dissolved oxygen monitoring data to the agencies listed in Part
I.A.13 of the NDPES permit.

66.     On February 24, 2019, the New Hampshire Union Leader published an article
based on an interview with Jim Andrews, president of Defendant Granite Shore Power LLC. The
paper reported that the Station will continue to operate well beyond this calendar year, and for
the foreseeable future.

## VI.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### Blockage of the Zone of Fish Passage
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)
As Against Defendants Granite Shore Power LLC and GSP Merrimack LLC

67.     Plaintiffs reallege and incorporate all preceding paragraphs, as if fully set forth
herein.

68.     The NPDES Permit requires that: "[t]he combined thermal plumes for the station
shall . . . not block the zone of fish passage . . . ." NPDES Permit at Part I.A.1.g (p. 3).

69.     Plaintiffs are informed and believe, and thereupon allege, that Defendants'

operation of the Station has caused, and continues to cause, thermal plumes that block the zone of fish passage in the Merrimack River.

70.     Violations of the NPDES Permit requirement that the thermal plume not block the zone of fish passage have occurred and continue to occur, at least, on all occasions that the Station's thermal plume causes temperatures in the River, during spring and summer months, to exceed fish tolerance thresholds for any life stage of any native species, and each such occasion is a violation or violations of the NPDES Permit and section 301(a) and section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

71.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

72.     Wherefore Plaintiffs pray for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Change to the Balanced and Indigenous Population of the Merrimack River
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)
As Against Defendants Granite Shore Power LLC and GSP Merrimack LLC**

73.     Plaintiffs reallege and incorporate all preceding paragraphs, as if fully set forth herein.

74.     The NPDES Permit requires that: "[t]he combined thermal plumes for the station shall . . . not change the balanced indigenous population of the receiving water. . . ." NPDES Permit at Part I.A.1.g (p. 3).

75.     Plaintiffs are informed and believe, and thereupon allege, that Defendants' operation of the Station has caused, and continues to cause, a thermal plume that has changed, and continues to change, the balanced indigenous population of the Merrimack River.

14

76. Violations of the NPDES Permit requirement that the thermal plume shall not change the balanced indigenous population of the Merrimack River have occurred continuously on all days within the statutory period, and each day is a violation of section 301(a) and section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

77. Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

78. Wherefore Plaintiffs pray for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Contact with the Surrounding Shorelines
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)
### As Against Defendants Granite Shore Power LLC and GSP Merrimack LLC

79. Plaintiffs reallege and incorporate all preceding paragraphs, as if fully set forth herein.

80. The NPDES Permit requires that: "[t]he combined thermal plumes for the station shall . . . have minimal contact with the surrounding shorelines." NPDES Permit at Part I.A.1.g (p. 3).

81. Plaintiffs are informed and believe, and thereupon allege, that Defendants' operation of the Station has caused, and continues to cause, a thermal plume that has more than minimal contact with the surrounding shorelines.

82. Violations of the NPDES Permit requirement that the Station's thermal plume have only minimal contact with the surrounding shorelines have occurred and continue to occur on all days when the thermal plume from the Station extends from shoreline to shoreline or for thousands of feet down the near shore of the Merrimack River. Such dates of violation occur

15

principally during summer months and each such day is a violation of the NPDES Permit and

section 301(a) and section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

83.     Continuing commission of the acts and omissions alleged herein irreparably

harms water quality, Plaintiffs, and their members, for which harm Plaintiffs have no plain,

speedy, or adequate remedy at law.

84.     Wherefore Plaintiffs pray for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Violation of New Hampshire Water Quality Standards
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)
### As Against Defendants Granite Shore Power LLC and GSP Merrimack LLC

85.     Plaintiffs reallege and incorporate all preceding paragraphs, as if fully set forth

herein.

86.     The NPDES Permit requires that the Station's discharges "shall not jeopardize

any Class B use of the Merrimack River and shall not violate applicable water quality standards."

NPDES Permit at Part I.A.1.b (p. 2).

87.     Plaintiffs are informed and believe, and thereupon allege, that Defendants'

operation of the Station has jeopardized, and continues to jeopardize, a Class B use of the

Merrimack River, *i.e.*, fishing.

88.     Plaintiffs are informed and believe, and thereupon allege, that Defendants'

operation of the Station and their thermal discharges have caused, and continue to cause,

violations of applicable water quality standards set forth or referenced in paragraphs 32 to 41,

above, due to the impacts described in paragraphs 48 to 65, above, and pages 6 to 9 of Plaintiffs'

notice of intent to sue, attached hereto as Exhibit B.

89.     Violations of the NPDES Permit requirements that the Station shall not jeopardize

16

any Class B use of the Merrimack River and shall not violate applicable water quality standards

have occurred continuously on all days within the statutory period, and each day is a violation of

the NPDES Permit and Section 301(a) and Section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

90.     Continuing commission of the acts and omissions alleged herein irreparably

harms water quality, Plaintiffs and their members, for which harm Plaintiffs have no plain,

speedy, or adequate remedy at law.

91.     Wherefore Plaintiffs pray for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

### Failure to Monitor and Report
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)
### As Against All Defendants

92.     Plaintiffs reallege and incorporate all preceding paragraphs, as if fully set forth

herein.

93.     The NPDES Permit requires continuous river surface temperature monitoring:

Continuous river surface temperature monitoring in the vicinity of the Merrimack
Generating Station shall be conducted on the following basis. Open-river surface
water temperatures will be continuously monitored at control Station N-10,
effluent discharge station Zero, and mixing zone Station S-4 . . . . The discharge
Station Zero temperature monitoring probe will remain in place and in operation
year round. . . . Monitoring program data shall be reported in accordance with
Paragraph 13, below.

NPDES Permit at Part I.A.11.a (p. 16).

94.     The NPDES permit also requires continuous monitoring of dissolved oxygen:

"The permittee shall continuously monitor the dissolved oxygen content of both an ambient river

control station and the circulating water discharge. . . ." NPDES Permit at Part I.A.12.b (p. 17).

95.     The NPDES permit also requires that the continuous monitoring results be

reported to government authorities periodically:

17

All biological and hydrological monitoring program data shall be submitted to the NHDES, NHF&GD, USF&WS, and the Regional Administrator by December 31 of the following year.

NPDES Permit at Part I.A.13 (p. 17).

96.     Plaintiffs are informed and believe, and thereupon allege, that Defendants have never, since the NPDES permit went in to effect, submitted continuous temperature or dissolved oxygen monitoring data to EPA and the other above-referenced agencies identified in Part I.A.13 of the NPDES Permit as required by the permit.

97.     Plaintiffs are informed and believe, and thereupon allege, that Defendants collected continuous temperature and dissolved oxygen monitoring data and are in possession of such data, but have not reported such data to the agencies as required by Part I.A.13 of the NPDES Permit.

98.     Violations of the NPDES Permit's monitoring and reporting requirements have occurred, continue to occur, and constitute continuing violations of the NPDES Permit and section 301(a) and section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

99.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

100.     Wherefore Plaintiffs pray for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.  Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with the NPDES Permit;

c.  Order Defendants to take appropriate actions to remediate the harm caused by the violations of the NPDES Permit and the CWA, to the extent possible;

d.  Order Defendants to submit all past, present, and future temperature and dissolved oxygen data to the agencies specified in Part I.A.13 of the NPDES Permit;

e.  Order Defendants to pay up to $37,500 per day per violation for all Clean Water Act violations occurring prior to November 2, 2015, and up to $53,484 per day per violation for all Clean Water Act violations that occurred after November 2, 2015, as provided by sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1–19.4, or as further adjusted pursuant to the Federal Civil Penalty Inflation Adjustment Act of 2015 and EPA's Civil Monetary Penalty Inflation Adjustment Rules;

f.  Order Defendants to pay the costs of litigation, including Plaintiffs' reasonable investigative costs, attorneys' fees, witness and consultant fees, and other costs, in accordance with section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

g.  Award any such other and further relief as this Court may deem appropriate.

Dated this 4th day of March, 2019                Respectfully submitted,

/s/ *Daniel J. Mullen*
Daniel J. Mullen, Bar No. 1830
Meaghan A. Jepsen, Bar No. 266707
Ransmeier and Spellman P.C.
One Capitol Street
Concord, NH 03302-0600
(603) 410-6643
dmullen@ranspell.com
*Attorneys for Plaintiff Sierra Club, Inc.*

/s/ *Thomas F. Irwin*
Thomas F. Irwin, Bar No. 11302
Conservation Law Foundation
27 North Main Street
Concord, NH 03301
(603) 573-9139
tirwin@clf.org
*Attorney for Plaintiff Conservation Law*
*Foundation, Inc.*

_____
Edan Rotenberg
(motion for pro hac vice admission to be filed)
SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038
212-242-2355, ext. 2
855-242-7956 (fax)
edan@superlawgroup.com
*Attorneys for Plaintiffs*
*Sierra Club, Inc. and*
*Conservation Law Foundation, Inc.*

4838-5232-8073, v. 1