UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Sierra Club, Inc., et al.

        v.                          Civil No. 19-cv-216-JL

Granite Shore Power LLC, et al.

**MEMORANDUM ORDER**

This case involves the pleading requirements of a citizen-suit under the Clean Water Act.  Defendants Granite Shore Power LLC, GSP Merrimack LLC (collectively, "Granite Shore"), and Public Service Company of New Hampshire d/b/a Eversource Energy ("PSNH") – the respective current and former operators of the Merrimack Station power plant – have moved to dismiss the plaintiffs' complaint on jurisdictional and sufficiency grounds. As alternative relief, the defendants have moved to stay these proceedings until the Environmental Protection Agency completes its ongoing permit renewal proceeding for Merrimack Station. After considering the parties' oral and written arguments, the court denies both requests for relief.

To invoke a federal court's jurisdiction at this pre-discovery stage, a plaintiff need only allege Article III standing through three familiar elements:  injury, traceability, and redressability.  The plaintiffs' complaint and their pre-suit Notice Letter clear this bar.  They sufficiently allege that the defendants violated the conditions set by Merrimack Station's operating permit, and thus the Clean Water Act, by continuously discharging excessive amounts of heated water into

the Merrimack River.  In addition, they sufficiently allege that the defendants, individually or successively, failed to report federally mandated monitoring that may be probative of continuing Clean Water Act violations.  Drawing all reasonable inferences in the plaintiffs' favor, these allegations sufficiently state an injury-in-fact fairly traceable to the defendants' alleged continuing violations of the Clean Water Act.  Moreover, they demonstrate how the plaintiffs' requests for legal and injunctive relief could redress the alleged ongoing harm to their associational interests.  As such, this court has subject matter jurisdiction, see 28 U.S.C. § 1331, to consider this case and the plaintiffs' requests for relief, as limited by the Clean Water Act's five-year statute of limitations period.

The defendants' request to stay this case is also denied. While the request is well-presented and advanced in good faith, the primary jurisdiction doctrine does not compel this court to wait and see if the EPA will issue new permit conditions for Merrimack Station before determining whether the defendants have violated the conditions of the existing permit.  The issues raised by the complaint are not beyond the core competency of this court.  Nor are they so technical or suffused by policy considerations that this court's determination will intrude upon the very different question before the EPA.  As such, while elements of the EPA's final permit decision would indeed aid this court's inquiry, the court declines to delay these proceedings until the EPA issues a revised final permit as part

of its now 27-year-long administrative review.  Both motions are denied.

## I.    <u>Background</u>[1]

Merrimack Station is a coal-fueled power plant sitting on the western banks of the Merrimack River on a 5.8 mile stretch known as Hooksett Pool.[2]  Merrimack Station utilizes a "once-through" cooling system, which each day draws about 287 million gallons of water from the Merrimack River, dumps "waste heat" into it, and then discharges that heated water (or "thermal effluent") back into the river.[3]  If left unchecked, heated discharges can significantly impact the temperature of Hooksett Pool, which in turn can harm the surrounding ecology.[4]  As such, Merrimack Station's discharges of heat and other pollutants into the Merrimack River must comply with a federally issued, National Pollutant Discharge Elimination System ("NPDES") permit.[5]

In 1992, the Environmental Protection Agency issued PSNH a NPDES permit, which specifies that Merrimack Station's discharges shall not violate any applicable water quality standards, including State of New Hampshire standards protecting

---

[1] The following account draws from the non-conclusory facts alleged in the complaint and the submitted documents referenced therein.

[2] Compl. (doc. no. 1) ¶ 2.

[3] Id. ¶ 3.

[4] Id.

[5] See id. ¶¶ 21-24.

aquatic life, biodiversity, and fishing rights.[6]  The permit also
requires that the station's operator continuously monitor the
Merrimack River's temperature and dissolved oxygen levels,[7] and
submit this data annually to state and federal regulators.[8]

In 2011, the EPA found in draft determinations for a new
permit that "the evidence as a whole . . . indicate[d] that
Merrimack Station's thermal discharge has caused, or contributed
to, appreciable harm to Hooksett Pool's balanced, indigenous
population of fish."[9]  The EPA also found that Merrimack
Station's thermal discharges violated New Hampshire's water
quality standards.[10]  These findings, as characterized by the
complaint, include that:

- "Temperature data from summer months show completely-mixed
  lower Hooksett Pool waters can be 3.6° to 7.2° Fahrenheit

---

[6] See NPDES Permit NH0001465 (doc no. 1-1) at 2; see also id. at
3 (imposing other effluent limitations, including:  "[t]he
combined thermal plumes for the station shall:  (a) not block
the zone of fish passage, (b) not change the balanced indigenous
population of the receiving water, and (c) have minimal contact
with the surrounding shorelines.").

[7] See id. at 3, 16-17.

[8] Id. at 17.

[9] See Compl. (doc. no. 1) ¶¶ 63-64; see also EPA - New England
Clean Water Act NPDES permitting Determinations for the Thermal
Discharge and Cooling Water Intake Structures at Merrimack
Station in Bow, New Hampshire NPDES permit No. NH 0001465, at
viii and 121 ("2011 Draft Filing"), available at
https://www3.epa.gov/region1/npdes/merrimackstation/pdfs/Merrima
ckStationAttachD.pdf.

[10] 2011 Draft Filing, supra n.9, at 178.

warmer, and at times more than 10° Fahrenheit warmer, than upstream waters."[11]

- "During summer months thermal discharges from Merrimack Station cause stratification of the water and consequent low dissolved oxygen in the underlying strata."[12]

- "[T]he Station's abrupt shutdowns in the colder seasons cause 'cold shocks,' i.e., a relatively rapid reduction in water temperatures, which can lead to the physiological impairment or death of fish in the river."[13]

- "The Station's operations have contributed to a nearly 95 percent decline in resident fish species in the Hooksett Pool, while allowing for certain harmful, non-native, heat[-]tolerant species to upset the ecological balance in the river."[14]

Plaintiffs Sierra Club and Conservation Law Foundation, both nonprofit membership organizations "dedicated to the protection and preservation of the environment," have hundreds of members in New Hampshire, many of whom "use, recreate upon," and "care very deeply" about the Merrimack River.[15] In November

---

[11] Compl. ¶ 56.

[12] Id. ¶ 58.

[13] Id. ¶ 60.

[14] Id. ¶ 61. The plaintiffs also allege that neither defendant has submitted continuous thermal monitoring or dissolved oxygen monitoring data to required governmental agencies since 1992 – the year the permit first went into effect. Id. ¶ 65; see also Pls.' Surreply (doc. no. 26) at 3 (clarifying that while the defendants have in fact submitted reports to the EPA, these reports contain daily statistical summaries rather than the actual measurements of temperature, dissolved oxygen, and other parameters collected by the defendants every 15 minutes from each monitoring location).

[15] On July 30, 2019, the plaintiffs filed declarations, at the court's request, on behalf of three of their members, which describe how these members have been harmed by Merrimack Station's alleged environmental impact. See MacBride Decl.

2018, the plaintiffs notified the defendants and the EPA that they intended to file suit to redress past and ongoing harm to their members' interests caused by the defendants' purported violations of the Clean Water Act,[16] as required by the Act and corresponding regulations.[17]  On December 21, 2018, the plaintiffs similarly notified the New Hampshire Department of Environmental Services.[18]  Neither the United States nor the State of New Hampshire commenced a public investigation or judicial action in response to the pre-suit notices.  The plaintiffs therefore filed a complaint for declaratory and injunctive relief and civil penalties.[19]

---

(doc. no. 29-1); Reid Decl. (doc. no. 29-2); Winnett Decl. (doc. no. 29-3).  The Winnett declaration has since been withdrawn. See doc. no. 32.  Because the defendants did not challenge any individual member's standing in their motion to dismiss, the court makes no determinations about the sufficiency of these declarations at this time.

[16] Compl. (doc. no. 1) ¶ 8; see also Nov. 1, 2018 Ltr. from Edan Rotenberg, counsel for plaintiffs, to Granite Shore and PSNH (doc. no. 1-2) at 5 ("Notice Letter").

[17] See 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. §§ 135.1 to 135.3.

[18] Compl. ¶ 9.

[19] In their opposition briefs, the plaintiffs clarified that Counts 1-4 only concern Granite Shore and its operation of Merrimack Station after 2017, see Pls.' Obj. to Mot. to Dismiss Mem. (doc. no. 17-1) at 1-2, that they do not seek civil penalties for any alleged violations outside the statute of limitations period, see id. at 18, and that the defendants have submitted some monitoring data to the EPA, see id. at 8-9 n.5. The court assesses the sufficiency of the complaint and the merits of the defendants' motion to dismiss in light of these clarifications.

In their briefing on the defendants' motion to stay, the parties both note that since 1997, the EPA has been conducting an ongoing administrative proceeding to renew or revise Merrimack Station's permit.[20]  Although NPDES permits typically have a five-year term,[21] EPA regulations provide that an application for a new permit administratively continues the term and conditions of a current permit until the EPA concludes its permit review.[22]  In 2011, the EPA issued a draft new NPDES permit for public comment, but made no final determination.[23]  In 2013, the EPA, in responding to a mandamus action, represented to the First Circuit Court of Appeals that it intended to finalize the permit within three years.[24]  In 2017, however, the EPA reopened the public comment period to address "a variety of significant new developments"[25] and represented to the Court of

---

[20] The court provides this background solely as context for the defendants' motion to stay, which the defendants request be granted should the court deny their motion to dismiss.  As such, the court does not take these allegations as true, as it would do in ruling on a Rule 12 motion to dismiss.

[21] See 33 U.S.C. § 1342(a)(3) & (b)(1)(B).

[22] See 40 C.F.R. § 122.6(a).

[23] See 2011 Draft Filing, supra n.9; EPA, Fact Sheet for Merrimack Station Draft NPDES permit No. NH0001465, AR-608 (Sept. 29, 2011), available at https://www3.epa.gov/region1/npdes/merrimackstation/pdfs/MerrimackStationFactSheet.pdf ("2011 Draft Filing Fact Sheet").

[24] See EPA Obj. to Petition for Mandamus, Sierra Club v, EPA, No. 12-1860 (1st Cir. Mar. 14, 2013) at 23, 29 (filed as doc. no. 18-3).

[25] See EPA, Statement of Substantial New Questions, AR-1534, at 6, 37 (July 24, 2017) ("EPA Substantial New Questions"), available at

Appeals that its renewal adjudication would take one more year.[26] In an August 2018 letter, the EPA "estimate[d] being able to issue the final permit" before Spring 2019.[27]  To date, EPA has not submitted a full draft of a new or revised permit to any party or to any other regulatory agencies.[28]

## II.  Applicable Legal Standard

### A.    Standing

The defendants argue that the plaintiffs lack standing to sue in federal court.  "The Constitution limits the judicial power of the federal courts to actual cases and controversies." Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012) (citing U.S. Cons. Art. III, § 2 cl. 1).  "A case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" Id. (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).  "To satisfy the personal stake requirement a plaintiff must establish each part of a familiar triad:  injury, causation, and redressability," id. (citing

_____

https://www3.epa.gov/region1/npdes/merrimackstation/pdfs/ar/AR-1534.pdf.

[26] See Judgment, In re Sierra Club, Inc., No. 16-2415 (1st Cir. Apr. 19, 2017), at 1 (filed as doc. no. 18-4).

[27] See Aug. 1, 2018 Ltr. from EPA to Sierra Club Envtl. Law Program re: NPDES permit for Merrimack Station (doc. no. 15-3) at 1.

[28] See Pls.' Obj. to Mot. to Stay Mem. (doc. no. 18-1) at 14.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)),
"for each claim he seeks to press and for each form of relief
that is sought." Davis v. FEC, 554 U.S. 724, 734 (2008); see
also Massachusetts v. U.S. Dep't of Health & Human Servs., 923
F.3d 209, 221 (1st Cir. 2019) (explaining that the burden of
alleging facts sufficient to prove these elements rests with the
party invoking federal jurisdiction).  "[E]ach element must be
supported in the same way as any other matter on which the
plaintiff bears the burden of proof," which is, "with the manner
and degree of evidence required at the successive stages of the
litigation." Katz, 672 F.3d at 72 (quoting Lujan, 504 U.S. at
561) (internal quotation marks omitted).  In considering the
pre-discovery grant of a motion to dismiss for lack of standing,
the court "accept[s] as true all well-pleaded factual averments
in the plaintiff[s'] . . . complaint and indulge[s] all
reasonable inferences therefrom in [their] favor." Id. at 70.
And while generally the court does not consider materials
outside the pleadings on a motion to dismiss, it may look beyond
the pleadings – to affidavits, depositions, and other materials
— to determine jurisdiction.  See Gonzales v. United States, 284
F.3d 281, 288 (1st Cir. 2002); Strahan v. Nielsen, 18-CV-161,
2018 WL 3966318, at *1 (D.N.H. Aug. 17, 2018).

### B.  Failure to state a claim

Motions to dismiss under Rule 12(b)(6) for the legal
insufficiency of a complaint impose a similar standard.  See
Katz, 672 F.3d at 71 (citing Nisselson v. Lernout, 469 F.3d 143,
150 (1st Cir. 2006)).  The court makes determinations about the

sufficiency of a complaint through a "holistic, context-specific analysis." Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). First, it "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Zenon v. Guzman, 924 F.3d 611, 615 (1st Cir. 2019) (citations and quotation marks omitted). It then "evaluate[s] whether the remaining factual content supports a 'reasonable inference that the defendant is liable for the misconduct alleged.'" In re Curran, 855 F.3d 19, 25 (1st Cir. 2017) (quoting Shay v. Walters, 702 F.3d 76, 82 (1st Cir. 2012)). In doing so, the court must accept "all well-pled facts in the complaint as true" and construe all reasonable inferences in the plaintiff's favor. See Gilbert, 915 F.3d at 80. But it "need not give weight to bare conclusions, unembellished by pertinent facts." Shay, 702 F.3d at 82-83. If the complaint's factual averments are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," dismissal will be warranted. SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

## III. __Analysis__

The defendants raise three issues in their motion to dismiss. First, they contend that the court lacks subject matter jurisdiction because the plaintiffs have not demonstrated Article III standing to file suit against each defendant. Second, they argue that, because the Clean Water Act imposes a five-year statute of limitations for citizen suits, the

concurrent remedy doctrine time-bars the plaintiffs' equitable requests for pre-2014 monitoring data. Finally, they assert that because the plaintiffs' 2018 notice did not specify the dates that the defendants allegedly violated Merrimack Station's NPDES permit, the plaintiffs failed to provide sufficient pre-suit notice, which is a prerequisite for this court's subject matter jurisdiction. As discussed herein, the court agrees that the concurrent remedy doctrine time-bars the plaintiffs' requests for pre-2014 data, but rejects the defendants' contentions concerning the sufficiency of the complaint's standing allegations and the notice provided by the plaintiffs' pre-suit Notice Letter.

**A. Standing**

Standing is a threshold question in every case, as without standing, a party cannot invoke the court's "jurisdiction to decide the merits of the underlying case." United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992). This constitutional minimum consists of three elements: (1) that the plaintiff suffered an "injury in fact," (2) that the injury is "fairly traceable" to the defendant's allegedly unlawful conduct, and (3) that it is "likely" that the injury will be redressed by the relief requested. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 590 (1992); accord Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016); Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009). The burden of establishing standing lies with the plaintiffs, such that they must satisfy this three-part test for each claim they press and

for each form of relief they seek, see Davis, 554 U.S. at 734, with respect to each defendant, see Calzone v. Hawley, 866 F.3d 866, 869 (8th Cir. 2017); Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 769 n.6 (1st Cir. 2011) (citation omitted).

The first element, an alleged injury-in-fact, requires the plaintiff[s] to show "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical," or in simpler terms, some personal harm that "has either happened or is sufficiently threatening" rather than one that "might occur at some future time." Katz, 672 F.3d at 71-72 (citing Lujan, 504 U.S. at 560, 564). Second, the traceability (or causation) element "requires the plaintiff[s] to show a sufficiently direct causal connection between the challenged action and the identified harm." Id. Finally, the redressability element further requires the plaintiffs to "show that a favorable resolution of [their] claim would likely redress the professed injury." Id.

The defendants challenge the plaintiffs' standing to bring each claim of the five-count complaint on multiple grounds. The court therefore proceeds methodically to assess whether the plaintiffs have demonstrated standing for each claim pressed and for each form of relief sought. See Davis, 554 U.S. at 734; Peterson v. United States, 774 F. Supp. 2d 418, 423 (D.N.H. 2011) (citing Davis).

### 1. Counts 1-4: Granite Shore operational violations

Counts 1-4 allege that since 2018, Granite Shore violated Merrimack Station's permit by excessively discharging heated water into Hooksett Pool to the detriment of local fish passages, the balanced indigenous aquatic population, surrounding shorelines, and the Pool's local biological integrity. To support these counts, the complaint alleges, among other facts, that Granite Shore owns and operates Merrimack Station, that Merrimack Station discharges thermal effluent into Hooksett Pool in a manner or to a degree that harms the Pool's ecosystem (and thus the plaintiffs' members' interests), and that these discharges constitute a continuing violation of Merrimack Station's current permit conditions. To remedy these alleged injuries, the plaintiffs request declaratory and injunctive relief, as well as civil penalties.

The defendants contend that, for purposes of standing, these allegations are deficient because they do not demonstrate that the plaintiffs' alleged injury – the adverse impact of this pollution on their members' health and environmental interests[29] – is "fairly traceable" to Granite Shore's operation of Merrimack Station. Relying on a previous order from this court, Conservation Law Foundation, Inc. v. Pub. Serv. Co. of N.H., No. 11-cv-353, 2012 WL 4477669, at *6-7 (D.N.H. Sept. 27, 2012), they assert that to satisfy the traceability element at this stage, the plaintiffs had to instead allege that Merrimack

---

[29] See Compl. ¶ 16.

Station increased operations or thermal discharges after Granite Shore acquired it in January 2018.[30]  The court disagrees.

In CLF v. PSNH, the court considered whether, under the Clean Air Act, CLF could challenge planned changes and repairs to Merrimack Station that would allegedly increase its carbon emissions beyond existing levels.  The Clean Air Act did not require the defendant, PSNH, to have a permit for the station's regular operation or the then-existing emissions.  But the Act did require the defendants to obtain a permit for planned changes that would increase the then-existing emissions.  This court held that because the "suit challenge[d] changes to an existing facility that was already operating and emitting pollutants," the sole allegation that Merrimack Station exposed CLF's members to pollutants was insufficient to confer standing.  Id. (emphasis added).  Instead, for CLF to show its injuries were "fairly traceable" to PSNH's allegedly unlawful activity, this court explained that the "the real question [wa]s whether those members [we]re exposed to different or greater amounts of pollutants than they would have been had the permitting process been observed" (that is, had PSNH obtained the required permit before starting its planned changes).  Id.

Here, the plaintiffs' complaint raises a completely different standing question:  are Granite Shore's thermal discharges already violating the effluent baselines established

---

[30] See Defs.' Mot. to Dismiss Mem. (doc. no. 14-1) at 15-17 (citing CLF v. PSNH, No. 11-cv-353, 2012 WL 4477669, at *6-7 (D.N.H. Sept. 27, 2012)).

by Merrimack Station's current NPDES permit?  If yes, any injury
to the plaintiffs' members would necessarily result, at least to
some degree, from Granite Shore's purported violations.  The
fact that PSNH, as the prior owner, may have operated Merrimack
Station in a similar manner does not impact this inquiry,
especially because the plaintiffs allege that PSNH's operation
also violated the permit.  Nor do the outside-the-complaint
facts that Merrimack Station now operates seasonally and
discharges less heat change this court's pre-discovery
determination.  See Katz, 672 F.3d at 72 (for a pre-discovery
challenge of standing, the court "accept[s] as true all well-
pleaded factual averments in the plaintiff[s'] . . . complaint
and indulge[s] all reasonable inferences therefrom in [its]
favor").  At best, these facts, if even properly considered,
evidence that Granite Shore took steps to reduce Merrimack
Station's environmental impact on Hooksett Pool.  But they do
not establish that these new operating parameters comply with
the permit's baseline restrictions.  Accordingly, the
plaintiffs' allegations, at this stage of litigation,
sufficiently demonstrate their standing to bring Counts 1-4.

### 2.    Count 5: Reporting violations

Count 5 alleges that both defendants failed to report all
continuous temperature and dissolved oxygen monitoring data to
the EPA as required by Merrimack Station's NPDES permit.
Although the defendants reported daily statistical summaries to
the EPA, the plaintiffs maintain that these reports omitted the

actual measurements that the defendants collected every 15 minutes.[31]  The complaint therefore seeks an order compelling the defendants to report such data to the EPA and other agencies. The defendants contend that the plaintiffs lack standing to seek such an order for three reasons, none of which persuade the court at this stage of the proceeding.

First, the defendants argue that the plaintiffs lack standing as to PSNH because an injunction cannot, as a matter of law, redress past statutory violations that cannot reoccur given PSNH's divestment of Merrimack Station.  The court disagrees.  A district court may grant injunctive relief to a prevailing plaintiff that states a "sound basis for equitable relief." City of Los Angeles v. Lyons, 461 U.S. 95, 101–02, (1983).  To satisfy this requirement, the plaintiff must either show "a likelihood of future unlawful conduct on the defendant's part" or "that some past unlawful conduct has continuing impact into the future."  Lopez v. Garriga, 917 F.2d 63, 67 (1st Cir. 1990).

Here, the plaintiffs' allegations satisfy the latter requirement.  The plaintiffs seek to compel PSNH to report data from its tenure as Merrimack Station's operator, as it was required to do by the permit, so that they can, among other objectives, use this data to ensure that PSNH's successor will comply with the permit's operating conditions.  Although PSNH no

---

[31] See Pls.' Surreply to Mot. to Dismiss (doc. no. 26) at 3.  At oral argument, the defendants represented that they had submitted 15-minute interval data to the EPA for 2017, and that this information should be available on the EPA's website.

longer operates Merrimack Station and thus cannot itself violate the permit, its pre-divestment operation remains relevant to the inquiry into whether Granite Shore, as the new operator, operates Merrimack Station in a manner that violates the permit and the Clean Water Act.  For example, if Granite Shore operates Merrimack Station in a similar manner to PSNH, then PSNH's data could be probative as to whether Granite Shore's current operations violate permit conditions.  The failure to report such data is fairly traceable to PSNH as the data's collector. And the plaintiffs' requested declaratory judgment and injunction will likely redress their alleged harm (and likely will aid the court in fashioning appropriate injunctive relief). See also United States v. Sea Bay Development Corp., No. 2:06-cv-624, 2007 U.S. Dist. LEXIS 33734, at *9-12 (E.D. Va. May 8, 2007) (rejecting contention that a plaintiff could not state a claim against an entity no longer having control over a polluting property because the relief sought was a "restorative or mitigating injunction" (that is, an order to clean up the past pollution)).

In their Reply, the defendants assert that under the Purchase and Sale Agreement between PSNH and Granite Shore, PSNH transferred all "Books and Records" to Granite Shore.[32]  If PSNH

---

[32] See Defs.' Reply (doc. no. 22-0) at 5; see also Excerpts from Station Purchase and Sales Agreement (doc. no. 22-4) § 2.1(f)). At oral argument, the defendants further represented that PSNH had in fact conveyed all records in its possession to Granite Shore.  The plaintiffs then agreed to explore the need for PSNH's future involvement in this matter, given this representation.

complied with this provision and transferred all monitoring data, as well as legal obligations concerning that data, to Granite Shore, then PSNH may have strong grounds for similarly conclusive relief in a different procedural posture. For now, the court must disregard this outside-the-complaint fact and focus solely on whether the allegations in the complaint support the reasonable inference that plaintiffs have standing to bring this case. See Katz, 672 F.3d at 72.

Second, the defendants contend for the first time in their Reply that the plaintiffs have no actual injury-in-fact concerning PSNH's reports because they do not bear on whether the current permit holder Granite Shore is discharging effluents in excess of the permit's maximum levels.[33] This new argument is not well received, as the defendants previously represented that "[t]his Motion to Dismiss is not based on Plaintiffs' alleged 'injury-in-fact.'"[34] "Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion." McCoy v. Massachusetts Inst. of Tech., 950 F.2d 13, 22 n.7 (1st Cir. 1991). For this reason, courts in the First Circuit consistently refuse to consider arguments raised for the first time by a moving party's reply memorandum, absent exceptional circumstances. See, e.g., id.; General Linen Serv., Inc. v. General Linen Serv. Co., 25 F. Supp. 3d 187, 192 (D.N.H. 2014) (McCafferty, J.); see also

_____

[33] See Defs.' Reply to Mot. to Dismiss (doc. no. 22) at 6.
[34] Defs.' Mot. to Dismiss Mem. (doc. no. 14-1) at 13 n.17.

Berwind Prop. Grp. Inc. v. Envtl. Mgmt. Grp., Inc., Civ. A. No. 04-11411, 2007 WL 4707647, at *6 (D. Mass. Feb. 5, 2007) (Gorton, J.) (a "defendant . . . will not be permitted to amend the nature of its motion in a reply brief"). Regardless, even if the defendants had raised that argument in their motion to dismiss, it lacks merit. As discussed above, the court draws the reasonable inference that PSNH's data may bear on whether Granite Shore, in continuing to operate Merrimack Station, is discharging effluents in excess of the permit's conditions. As such, PSNH cannot deprive the plaintiffs of their right to seek this previously collected monitoring data, at least at the pre-discovery stage, by simply disclaiming any interest in Merrimack Station's operations.[35]

Finally, the defendants assert that the plaintiffs lack standing to seek equitable relief against Granite Shore because its 2018 annual report — that is, its annual report for data gathered in 2018 (the first year Granite Shore operated the station) — is not due until December 2019. While this may be true, the court draws the reasonable inference from the complaint's allegations that Granite Shore, as a successive owner, may have inherited any outstanding data reporting obligations or liabilities of Merrimack Station's previous

---

[35] As discussed above, the court's standing findings in this order are without prejudice to the defendants' right to challenge whether evidence in fact supports the plaintiffs' standing allegations once discovery is completed. See supra at 17.

owner, PSNH, with respect to prior reporting years.[36]  As such, any past failures to report data are fairly traceable, at least at this stage, to Granite Shore and could be redressed by an equitable order from this court.

In sum, the court finds that the complaint's allegations satisfy the familiar trio of injury, causation, and redressability to confer Article III standing.  Accordingly, jurisdiction exists to consider the merits of the plaintiffs' claims.

**B.  Statute of limitations**

Next, the defendants contend that the five-year statute of limitations for federal civil enforcement actions, see 28 U.S.C. § 2462, time-bars the plaintiffs from seeking injunctive relief for data reports due before January 3, 2014 – the date five years and sixty days (to allow for pre-suit notice) prior to when the plaintiffs filed suit.  In particular, the defendants contend that even though § 2462 is silent as to equitable requests, the concurrent remedy doctrine time-bars such requests when they are based on the same facts supporting time-barred civil penalties claims.  As discussed below, the court agrees and accordingly limits the plaintiffs' report-related claims.

---

[36] See also Defs.' Reply to Mot. to Dismiss (doc. no. 22) at 5 (representing that the Purchase and Sale agreement between PSNH and Granite Shore provided for the transfer of all "Books and Records" by PSNH to Granite Shore).

Although the Clean Water Act contains no statute of
limitations, the parties agree that courts routinely apply
§ 2462's five-year statute of limitations to Clean Water Act
citizen suits.  See, e.g., U.S. Pub. Interest Research Grp. v.
Atl. Salmon of Maine, LLC., 257 F. Supp. 2d 407, 426 (D. Me.)
(Carter, S.J.), aff'd 339 F.3d 23 (1st Cir. 2003) (compiling
cases).  This statute provides that "an action, suit or
proceeding for the enforcement of any civil fine, penalty, or
forfeiture, pecuniary or otherwise, shall not be entertained
unless commenced within five years from the date when the claim
first accrued . . . ."  28 U.S.C. § 2462.  By the statute's
express language, the five-year limitations period applies to
actions to enforce a "civil fine, penalty, or forfeiture."  Id.
As such, at least one court has found that "[t]he plain language
of section 2462 does not apply to equitable remedies."  United
States v. Banks, 115 F.3d 916, 919 (11th Cir. 1997).

Under the concurrent remedy doctrine, however, "equity will
withhold its relief in such a case where the applicable statute
of limitations would bar the concurrent legal remedy."  See Cope
v. Anderson, 331 U.S. 461, 464 (1947).  "[R]emedies are
concurrent for purposes of the concurrent remedy doctrine" if a
suit in equity "and an action at law can be brought on the same
facts."  Sierra Club v. Otter Tail Power Co., 615 F.3d 1008,
1019 (8th Cir. 2010); see also Lehane v. Wachovia Mortg., FSB,
No. 12-cv-179-PB, 2013 WL 4677753, at *1 (D.N.H. Aug. 30, 2013)
(Barbadoro, J.).  The doctrine thus bars plaintiffs from
pursuing an equitable claim "where the only difference between

it and a time-barred legal claim is the relief sought," such as the case here. Sierra Club v. Okla. Gas & Elec. Co., 816 F.3d 666, 675 (10th Cir. 2016) (quotation omitted); see also Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991) ("To prevent plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labelling . . . courts must necessarily focus upon the substance of an asserted claim as opposed to its form.").

Courts have repeatedly held that the concurrent remedy doctrine applies, without exception, to interest groups suing under environmental statutes. See Nat'l Parks & Conservation Ass'n v. TVA, 502 F.3d 1316, 1327 (11th Cir. 2007) (invoking the concurrent-remedy doctrine against Sierra Club); Okla. Gas & Elec., 816 F.3d at 676 (same); Otter Tail, 615 F.3d at 1018-19 (same).[37]  In Okla. Gas & Elec., for example, the Tenth Circuit Court of Appeals rejected Sierra Club's argument that the concurrent remedy doctrine did not apply to claims under the Clean Air Act. 816 F.3d at 676.  There, Sierra Club argued that because the equitable relief it sought was different in nature and was not necessary to effectuate civil penalties, it was not concurrent.  The Court of Appeals disagreed and applied the doctrine because the legal and equitable claims appealed were brought on the same facts. Id. (also observing that "in the

---

[37] The Fifth Circuit Court of Appeals reached a similar holding in United States v. Luminant Generation Co., 905 F.3d 874, 885 (5th Cir. 2018), but then decided to rehear the matter en banc on July 10, 2019, after the parties had completed their briefing, see 929 F.3d 316 (5th Cir. 2019).

case of private litigants" filing citizen suits, "the
concurrent-remed[y] doctrine appears to be alive, well, and
strong"). Although the plaintiffs assert that this authority is
inapposite to this case because Okla. Gas & Elec., NPCA, and
similar cases were brought under the Clean Air Act's citizen
suit provision, rather than the Clean Water Act's, this court
fails to see the significance of this distinction. [38]  In each
case, private litigants effectively sued as private attorneys
general under a federal environmental law statute. And in each
case, the courts held or affirmed that the concurrent remedy
doctrine applies to suits brought by private litigants without
caveats unique to the Clean Air Act context.

The plaintiffs cited authority does not persuade this court
to diverge from this near-unanimous rule. Although several
courts have held that the concurrent remedy doctrine does not
preclude the government from bringing Clean Water Act cases
seeking equitable relief after the five-year statute of
limitations, see, e.g., United States v. Telluride Co., 146 F.3d
1241, 1248 n.12 (10th Cir. 1998); United States v. Cinergy
Corp., 397 F. Supp. 2d 1025, 1032 (S.D. Ind. 2005) (holding that
equitable relief remained available even though legal remedies
were time-barred), the plaintiffs point to no authority where a
court has declined to apply, or found an exception to, the

_____

[38] At oral argument, counsel for the plaintiffs elaborated that
under the Clean Water Act, a plaintiff can only sue for
continuing violations, while under the Clean Air Act, a
plaintiff can sue for both past and continuing violations.

doctrine for private litigants in citizen suits.  See also Okla.
Gas, 816 F.3d at 676 ("Sierra Club is not the government,
regardless of how it views its own role . . . and thus [is] not
eligible for the government's exemption.").  And while at least
a few courts have allowed the equitable claims in Clean Water
Act cases to proceed undeterred by any statute of limitations,
see United States v. Hobbs, 736 F. Supp. 1406, 1410 (E.D. Va.
1990), their holdings are limited to contexts where either the
government was the plaintiff, see id., or the defendants failed
to invoke the concurrent remedy doctrine at all, see N.C.
Wildlife Fed'n v. Woodbury, No. 87-584-CIV-5, 1989 U.S. Dist.
LEXIS 13915, *8-10 (E.D.N.C. Apr. 24, 1989).

        Applying these rules to the case at hand, the court finds
that the concurrent remedy doctrine time-bars the plaintiffs'
request for an order compelling the submission of pre-2013 data
– that is, data that was due more than five years before the
plaintiffs filed their complaint.  The plaintiffs seek this
relief (as well as the compelled production of present and
future data) to remedy the defendants' alleged violation of
Merrimack Station's permit conditions and the Clean Water Act.
But what matters for purposes of the concurrent remedy doctrine
is that the plaintiffs' equitable claims for pre-2014 data are
based on the same facts that would support time-barred legal
claims.  See Okla. Gas, 816 F.3d at 676.

        As an alternative argument, the plaintiffs assert that even
if the concurrent remedy doctrine applies to Clean Water Act
cases, their "claim for penalties has not accrued and the

statute of limitations has not commenced running" because the
defendants' reporting violations are "ongoing and continuous."
This theory has little merit.  It is now well-settled that in
Clean Water Act cases, "a claim first accrues on the date that a
violation first occurs," e.g., Black Warrior River-Keeper, Inc.
v. Drummond Co., Inc., 387 F. Supp. 3d 1271 (N.D. Ala. 2019)
(quoting Nat'l Parks, 502 F.3d at 1322), "regardless of whether
it continues to reacrrue," HEAL Utah v. PacifiCorp, 375 F. Supp.
3d 1231, 1249 (D. Utah 2019) (citing Okla. Gas & Elec., 816 F.3d
at 674).  This means that for the plaintiffs' reporting
violations claims, their claims first accrued on January 1 in
each year the defendants allegedly failed to submit data,
regardless of whether the violation is ongoing or continuous.
Although the plaintiffs cite to two district court decisions
that hold otherwise, see Atl. Salmon, 257 F. Supp. 2d at 427
("Defendants' violations of the CWA . . . have been continuous
and are still ongoing; thus, no 'accrual' has occurred in this
case . . . ."); United States v. Reaves, 923 F. Supp. 1530, 1534
(M.D. Fla. 1996) (same), those decisions are easily
distinguishable.[39]  Nevertheless, to the extent those non-binding

---

[39] In Atl. Salmon, the court considered whether the statute of
limitations barred judicial action against a salmon farmer that
had been releasing pollutants into a waterway without any NPDES
permit.  257 F. Supp. 2d at 427.  On appeal, the Court of
Appeals did not consider the question of when a claim accrues
for Clean Water Act violations that are continuous and ongoing –
an issue raised by the plaintiffs below.  See 339 F.3d 23.  And
in United States v. Reeves, the issue before the court was the

decisions hold that a claim does not accrue so long as a violation is continuing and ongoing, this court respectfully disagrees and instead defers to the more recent appellate and trial court decisions holding that claims accrue on the first date they become actionable.[40]

Additionally, the court disagrees with the plaintiffs' underdeveloped argument that the continuing violation doctrine tolls the statute of limitations for their pre-2014 reporting violations claims because the defendants remain in non-compliance.  The plaintiffs contend that their claims constitute "continuing violations" for purposes of the doctrine because "when a company has violated an effluent standard or limitation," including reporting requirements, it remains, for purposes of the Clean Water Act, "'in violation' of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation."[41]  This contention stretches the continuing violation doctrine too far.

statute of limitations for the government.  923 F. Supp. at 1534.

[40] The court also rejects the plaintiffs' contention that its reporting violation claims serially accrued "on each date after December 31."  See Pls.' Obj. to Mot. to Dismiss at 20 (quoting Notice Letter (doc. no. 1-2) at 10).  The plaintiffs cite no case law supporting this contention.  And even cases cited by the plaintiffs reject this contention.  See Black Warrior River-Keeper, 387 F. Supp. 3d 1271.

[41] Pls.' Opp. to Mot. to Dismiss Mem. (doc. no. 17-1) at 23 (quoting Gwaltney of Smithfield v. Chesapeake Bay Found. Inc., 484 U.S. 49, 68 (1987) (Scalia, J., concurring)).  In the plaintiffs' view, Justice Scalia's explanation applies to

Section 505(a) of the Clean Water Act permits citizen suits against any person "alleged to be in violation" of an NPDES permit. "Subject matter jurisdiction 'depends on the state of things at the time of the action brought'; if it existed when the suit was brought, 'subsequent events' cannot 'ous[t]' the court of jurisdiction." Gwaltney, 484 U.S. at 68 (Scalia, J. concurring) (quoting Mollan v. Torrance, 22 U.S. 539 (1824)) (emphasis added).[42]  As a result, it is true that even a one-time discharge of pollutants into a protected waterway can constitute a "continuing violation" under the Clean Water Act if the discharge does not significantly dissipate over time, and instead "continue[s] to have roughly the same net polluting effect over years or decades" thereafter.  See City of Mt. Park v. Lakeside at Ansley, LLC, 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2008) (analyzing the split among trial courts in applying

---

reporting violations because, under the Clean Water Act, citizen plaintiffs cannot sue for anything other than violations of "an effluent standard or limitation," see 33 U.S.C. § 1365; Gwaltney, 484 U.S. at 67-69 (Scalia, J., concurring); see also United States v. Smithfield Foods, Inc., 972 F. Supp. 338, 354 (E.D. Va. 1997), aff'd in part, rev'd in part, 191 F.3d 516 (4th Cir. 1999) (affirming imposition of penalties for reporting violations).

[42] As Justice Scalia elaborated:

> The phrase in § 505(a), "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state, rather than an act — the opposite of a state of compliance.  A good or lucky day is not a state of compliance.  Nor is the dubious state in which a past effluent problem is not recurring at the moment, but the cause of that problem has not been completely and clearly eradicated.

484 U.S. at 68 (Scalia, J., concurring).

Gwaltney); see also, e.g., North Carolina Wildlife Federation v. Woodbury, No. 87-584-CIV-5, 1989 WL 106517, at *1-2 (E.D.N.C. Apr. 25, 1989) (holding that fill-material discharges that ceased six years prior to a complaint constituted ongoing violations of the Clean Water Act).

But "[t]he continuing violation doctrine applies in narrow circumstances, usually in discrimination cases, to allow recovery for actions taken outside the limitations period when repeated conduct is necessary to cause an injury." Walbridge v. Ne. Credit Union, 299 F. Supp. 3d 338, 350 (D.N.H. 2018) (DiClerico, J.) (citing Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC, 794 F.3d 200, 205 (1st Cir. 2015). "In determining whether to characterize a violation as 'continuing,' it is important to distinguish between the 'present consequences of a one-time violation,' which do not extend the limitations period, and 'a continuation of a violation into the present,' which does." Nat'l Parks, 502 F.3d at 1322 (internal citations omitted). In other words, the doctrine typically applies to a "series of separate acts" that would not "be actionable on [their] own." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) (quotation marks and citations omitted); e.g., Ayala v. Shinseki, 780 F.3d 52, 58 (1st Cir. 2015); Quality Cleaning Prods., 794 F.3d at 205.

Here, the plaintiffs have not demonstrated that the harm caused by the defendants' alleged reporting violations is anything more than just the "present consequences" of an, albeit repeated, "one-time violation." Nat'l Parks, 502 F.3d at 1322

(internal citations omitted).  Nor have they demonstrated that it was necessary that the defendants fail to submit monitoring data over multiple years before a Clean Water Claim could accrue.  See Walbridge, 299 F. Supp. 3d at 350.  The court therefore finds the continuing violations doctrine does not apply to the defendants' purported reporting violations and limits the plaintiffs' ability to seek injunctive relief to failure-to-report claims arising on or after January 3, 2014.

### C.    Pre-suit Notice

Finally, the defendants argue that the plaintiffs' pre-suit Notice Letter failed to identify any specific dates for violations occurring after January 10, 2018, thereby depriving this court of subject matter jurisdiction.  The court disagrees.

The Clean Water Act requires plaintiffs to provide pre-suit notice to regulatory agencies and putative defendants before filing a citizen suit.  The notice must include:

> sufficient information to permit the recipient to identify [1] the specific standard, limitation, or order alleged to have been violated, [2] the activity alleged to constitute a violation, [3] the person or persons responsible for the alleged violation, [4] the location of the alleged violation, [5] the date or dates of such violation, and [6] the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3.  As the Court of Appeals has explained, "assessing whether these requirements have been met is a functional, fact-dependent, and case-specific inquiry." Paolino v. JF Realty, LLC, 710 F.3d 31, 37 (1st Cir. 2013).  "The key language in § 135.3(a) is that pre-suit notice must permit 'the

recipient' to identify the listed information, i.e., the specific standard at issue, the dates on which violations of that standard are said to have occurred, and the activities and parties responsible for causing those violations." Id. At a minimum, notice must "allow[] the putative defendants to identify and remedy the alleged violations." Id.

"The [Clean Water Act] does not require, however, that a citizen plaintiff 'list every specific aspect or detail of every alleged violation.'" Id. (quoting Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc., 50 F.3d 1239, 1248 (3d Cir. 1995)). "This is so because, 'in investigating one aspect'" of an alleged violation, "the other aspects of that violation . . . will of necessity come under scrutiny" by the putative defendant. Id. (quoting Hercules, 50 F.3d at 1248). The Ninth Circuit Court of Appeals, for example, has twice found that a notice letter alleging continuing unlawful discharges of pollutants need not list every date on which such discharges occurred. See id. (citing Waterkeepers N. Cal. v. AG Indus. Mfg., Inc., 375 F.3d 913 (9th Cir.2004); S.F. BayKeeper, Inc. v. Tosco Corp., 309 F.3d 1153, 1159 (9th Cir. 2002)). In both cases, other information in the notice letter concerning the cause and source of the alleged discharges permitted the defendants to identify an adequate number of specific dates on which these discharges occurred and to take remedial action. See Waterkeepers, 375 F.3d at 917-18 (violations occurred on "every rain event over 0.1 inches"); BayKeeper, 309 F.3d at 1159

(violations occurred "on each day when the wind has been sufficiently strong to blow" pollutants into adjacent slough).

Here, the plaintiffs' Notice Letter, despite identifying few specific dates for the alleged violations, provides sufficient regulatory notice for all counts in the complaint because it contains information from which the defendants could identify specific dates for purported violations. For Count 1 (the blockage of the zone of fish passage), the Notice Letter notes that violations occur whenever Merrimack Station's thermal plume cause Hooksett Pool temperatures to exceed fish tolerance levels for native species, including during Summer 2016.[43] The letter then refers to EPA draft filings listing temperature thresholds for certain native species.[44] By comparing these thresholds with temperature data collected in the spring and summer months of 2018 (the only spring and summer that Granite Shore operated Merrimack Station prior to the letter), Granite Shore could determine the prior dates on which its plume blocked the fish zone passage and possibly take remedial action based on its own understanding of the alleged violation's underlying cause. Likewise, for Count 3, the Notice Letter claims that Granite Shore violates the permit's shoreline restrictions on each day the thermal plume "extends from shoreline to shoreline," that is, each day "water temperatures in the entire

---

[43] See Notice Letter (doc. no. 1-2) at 5.

[44] Id. at 5 n.23; see also 2011 Draft Filing, supra n.9, at 196, 208-10.

lower reach of the Hooksett Pool" were at least 3.6° warmer than pre-discharged waters.[45]  Again, Granite Shore could determine the dates for these alleged violations from publicly available sources, including expert reports found in the EPA's administrative record, or from its own monitoring data.  Cf. Public Interest Research Group v. Hercules, Inc., 50 F.3d 1239 (3rd Cir. 1995) (noting that "to require each violation to be specifically identified would place an undue impediment before citizen suits" when notice recipients are "in just as good or better position than a citizen plaintiff to determine violations of a like nature").  Armed with this information, Granite Shore then could have attempted to remedy these alleged violations.

The Notice Letter also gives sufficient notice of the alleged violations underlying Counts 2 and 4, both of which concern prohibited changes to the Merrimack River's balanced and indigenous aquatic species.  The Notice Letter alerts Granite Shore that its thermal plume has changed the Merrimack's balanced indigenous population and violated local water quality standards "continuously on all days within the statutory period"[46] (or in other words, each day since Granite Shore took control of Merrimack Station in January 2018).[47]  The Letter then provides examples of these violations.  Building off Count 1, it

---

[45] Notice Letter at 6.

[46] Notice Letter at 11.

[47] See Pls.' Obj. to Mot. to Dismiss Mem. (doc. no. 17-1) at 21 n.14.

reports that in high spring and summer, water temperatures surpass survival thresholds for American Shad and Yellow Perch, and that in the cooler months, Merrimack Station's thermal plume has invited a strong population of non-native Asian Clams, which threatens the water quality needed for indigenous aquatic life.[48] Further, it refers the defendants to annual EPA/NHDES field investigations that confirm a high presence of Asian clams in the portions of Hooksett Pool subject to Merrimack Station's thermal plume since 2014.[49]  Finally, it notes that "abrupt shutdowns in the colder seasons could cause 'cold shocks', i.e., a relatively rapid reduction in discharge temperature, which can lead to the physiological impairment of fish and even to death."[50]

Lastly, the Notice Letter supplies clear notice for Count 5, which concerns the defendants' failure to report monitoring data, stating that the permit "requires that all data be submitted to EPA and other agencies by December 31 of the year following collection.  Therefore, with respect to each year of missing or incomplete data, a separate date of violation has

---

[48] Notice Letter at 7; see also 2011 Draft Filing at 196, 208-10 (incorporated by reference in Section II.A.1 of the Notice Letter and listing temperature thresholds for aquatic species native to Hooksett Pool).

[49] Notice Letter at 7; see also EPA Substantial New Questions, supra n.25, at 41-43 (describing certain field investigations at Hooksett Pool).  The court also observes that in March 2017, PSNH reported to the EPA that it had hired a consultant scientist to evaluate the Asian clam issues.  See id. at 42.

[50] Notice Letter at 8 (citing 2011 Draft Filing at 349).

occurred on each date after December 31 of the year following collection."[51]

The defendants assert that despite this information, the Notice Letter remains deficient because the terms "continuous" and "daily" do not enable the defendants to identify the specific date or dates of the alleged violations, which they contend is required by regulation.  They cite two district court opinions to support this position, but neither is instructive here.  In both cases, the district courts applied the Sixth Circuit's strict notice requirement to reject partially noticed Clean Water Act claims.  In Stephens v. Koch Foods, LLC, for example, citizen plaintiffs had notified defendants that they were continuously exceeding effluent limitations by including with their notice letter a chart detailing dates of alleged violations.  See 667 F. Supp. 2d 768, 787 (E.D. Tenn. 2009). The district court nevertheless rejected the argument that they could prove "additional violations of the same type" occurring after the notice letter "on summary judgment or at trial without having to include them in additional 60-day notice letters as the violations recur[red] or [we]re discovered." Id.  In that court's words, while such an approach was "indeed the rule in the Third Circuit" (and since Paolino, now also in the First Circuit), "it [wa]s not the law of the Sixth." Id. (rejecting Hercules, 50 F.3d at 1248).  The court therefore applied Sixth Circuit precedent mandating "strict compliance" with the notice

---

[51] Id. at 11.

requirements and found that the plaintiffs lacked standing for violations occurring after their notice letter issued. Id.

In that spirit, while "strict compliance" remains the rule in the Sixth Circuit, it is not the law of the First Circuit. Again, in the First Circuit, a citizen plaintiff need provide only "reasonable specificity." Paolino, 710 F.3d at 38 (quoting Hercules, 50 F.3d at 1248); see also Nat. Res. Council of Maine v. Int'l Paper Co., 424 F. Supp. 2d 235, 249 (D. Me. 2006) (Woodcock, J.) ("The proper inquiry is whether in practical terms, the notice was sufficiently specific to inform the alleged violator about what it was doing wrong, so that it knew what corrective actions would avert a lawsuit."). Here, this requirement is satisfied for Counts 2 and 4 because they concern cumulative impacts on Hooksett Pool's balanced indigenous population, which are measured over extended periods of time.[52] Cf. Swinomish Tribal Cmty. v. Fed. Energy Regulatory Comm'n, 627 F.2d 499, 517 (D.C. Cir. 1980) (observing that "at any given point, the sacrifices in environmental quality may appear to be marginal; but their cumulative adverse effect over time could be substantial"). In its 2011 Draft Filing, for example, the EPA concluded that "Merrimack Station's current thermal discharges are not satisfying" New Hampshire Water Quality Standards "based largely on Merrimack Station's fisheries data collected over 40 years."[53] The Notice Letter builds upon this finding by

---

[52] See also 2011 Draft Filing, supra n.9, at 46, 67 (measuring changes to indigenous species over time).

[53] Id. at xi, 30.

referencing this data, as well as regulatory comments submitted to the EPA in 2017 concerning cold shocks caused by Merrimack Station, as documented by PSNH's temperature data. As such, the plaintiffs' Notice Letter reasonably informed the defendants of their alleged misconduct, thereby satisfying the Clean Water Act's pre-suit notice requirement.

IV. **Motion to Stay**

As alternative relief, the defendants ask this court to stay proceedings in this case pending the EPA's issuance of a new (or renewed) Clean Water Act permit for Merrimack Station. They contend that the primary jurisdiction doctrine and considerations of judicial discretion compel a stay in this case. The court disagrees, declining to stay this matter pending the resolution of the EPA's 27-year-long permit renewal proceeding.

The primary jurisdiction doctrine, which the defendants' motion invokes, "requires a court to stay its hand while allowing an agency to address issues within its ken." Atl. Salmon of Me., 339 F.3d at 34. "[N]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case, the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot., 163 F.3d 74, 81 (1st Cir. 1998) (quoting United States v. Western Pac. R.R.

Co., 352 U.S. 59, 64 (1956)).  The Court of Appeals has provided

the following factors to help guide the district courts:

> 1) whether the agency determination l[ies] at the
> heart of the task assigned the agency by Congress;
> (2) whether agency expertise [i]s required to unravel
> intricate, technical facts; and (3) whether, though
> perhaps not determinative, the agency determination
> would materially aid the court.

Id.  "These factors . . . must be balanced against the potential

for delay inherent in the decision to refer an issue to an

administrative agency."  See id. (citing PHC, Inc. v. Pioneer

Healthcare, Inc., 75 F.3d 75, 80–81 (1st Cir. 1996)).

Here, this multifactor test balances against the grant of a

stay.  At its core, the EPA's current permit adjudication

concerns the content and scope of Merrimack Station's future

permit conditions.[54]  See 33 U.S.C. § 1342(a) (explaining the

EPA's permitting function).  This is a very different

determination than whether Merrimack Station is operating in

compliance with its current permit conditions.  See 33 U.S.C.

§§ 1319, 1365 (setting forth the enforcement process for

existing permits).  As the district court in Student Pub.

Interest Research Grp. of New Jersey, Inc. v. Fritzsche, Dodge &

Olcott, Inc. explained:

> Defendant[s'] argument confuses two events:  the
> present citizen's suit, to enforce an existing NPDES
> permit; and a renewal application . . . .  While the
> latter determination may well be within the EPA's
> primary jurisdiction, particularly since it involves
> interpretation of substantive rules concerning

---

[54] See also EPA Substantial New Questions, supra n.25.

> effluent limitations . . . , the determination as to
> whether defendant[s'] own monitoring reports reveal
> permit violations is fully within the Court's
> competence and jurisdiction.

579 F. Supp. 1528, 1537 (D.N.J. 1984), <u>aff'd</u>, 759 F.2d 1131 (3d
Cir. 1985).

Although this proceeding and the EPA's permit renewal
adjudication may very well involve several related issues,[55] the
defendants cite no cases in which a court stayed a Clean Water
Act citizen suit pending the issuance of a new NPDES permit on
primary jurisdiction or other equitable grounds.  Several
courts, by comparison, have denied motions to stay Clean Water
Act citizen suits where applications to modify NPDES permits
were pending before federal or state agencies.  <u>See,</u> <u>e.g.,</u> Me.
People's All. v. Mallinckrodt, Inc., 471 F.3d 277, 292 (1st Cir.
2006) (noting that "[o]n three different occasions, [the
district court] considered and thoughtfully rejected primary
jurisdiction challenges"); Fritzsche, 579 F. Supp. at 1537
(noting that "the doctrine of primary jurisdiction should be
invoked sparingly where it would serve to preempt a citizens'
suit"); Cal. Sportfishing Prot. All. v. City of W. Sacramento,
905 F. Supp. 792, 807 n.21 (E.D. Cal. 1995) (holding that
primary jurisdiction doctrine "has no application" in Clean
Water Act citizen suits); <u>cf.</u> Sierra Club v. Tri-State
Generation and Transmission Ass'n, 173 F.R.D. 275, 283-84

---

[55] <u>See</u> Defs.' Mot. for Stay Mem. (doc. no. 15-1) at 7-8, 9-11.

(D. Colo. 1997) (doctrine inapplicable to Clean Air Act citizen suits).

The court also declines to issue a stay as a matter of discretion. District courts "have the inherent authority to manage their dockets, including the power to stay proceedings when, in the court's exercise of its discretion, it deems such a stay appropriate." Emseal Joint Sys. Ltd. v. Schul Int'l Co., LLC, No. 14-cv-358, 2015 WL 1457630, at *1 (D.N.H. Mar. 27, 2015) (McAuliffe, J.). They cannot, however, dispense stays cavalierly. "'[T]here must be good cause for their issuance; they must be reasonable in duration; and the court must ensure that competing equities are weighed and balanced.'" Wells Fargo Fin. Leasing, Inc. v. Tulley Auto. Grp., Inc., No. 16-CV-218, 2016 WL 5660290, at *5 (D.N.H. Sept. 29, 2016) (McCafferty, J.) (quoting Marquis v. Fed. Deposit Ins. Corp., 965 F.2d 1148, 1155 (1st Cir. 1992)).

Here, the prolonged timeline for the EPA's permit renewal weighs against a stay. As echoed by the Court of Appeals, the delays in reviewing Merrimack Station's NPDES permit "continue to be concerning and extensive."[56] The EPA's permit review has been ongoing since 1992. While EPA has represented that it has been working hard to finalize this complex permit,[57] no definite end date is in sight. Even if the EPA were to issue a revised

_____

[56] Judgment, In re Sierra Club, Inc., No. 16-2415 (1st Cir. Apr. 19, 2017).

[57] See Aug. 21, 2018 Ltr. from EPA to Sierra Club Envtl. Law Program re: NPDES Permit for Merrimack Station, (doc. no. 15-3) at 1.

final permit for Merrimack Station in the coming months, the permit could still be challenged before the EPA's Environmental Board, see 40 C.F.R. § 124.19, and possibly a court. A stay pending the resolution of those proceedings would further delay a jury's resolution of this case. For these reasons, the court declines to impose a stay that would indefinitely delay consideration of the merits of the plaintiffs' claims.

## V.   Conclusion

For the above-stated reasons, the court finds that the plaintiffs' allegations and pre-suit Notice Letter sufficiently demonstrate that this court has jurisdiction to consider the merits of their claims, subject to the five-year time-bar on monetary and injunctive relief. In addition, it declines to stay these proceedings. Accordingly, the court denies the defendants' motion to dismiss[58] and their motion to stay proceedings pending EPA's permit review.[59]

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Dated:  September 13, 2019

cc:  Edan Rotenberg, Esq.
     Reed Super, Esq.
     Daniel J. Mullen, Esq.
     Thomas F. Irwin, Esq.

---

[58] Doc. no. 14.

[59] Doc. no. 15.

Wilbur A. Glahn, III, Esq.
Jennifer L. Parent, Esq.
P. Stephen Gidiere, III, Esq.
Thomas G. DeLawrence, Esq.