UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Sierra Club, Inc. and Conservation
Law Foundation, Inc.

    v.           Civil No. 19-cv-216-JL
                  Opinion No. 2020 DNH 205P

Granite Shore Power LLC; GSP Merrimack
LLC; and Public Service Company of New
Hampshire d/b/a Eversource Energy

**ORDER**

This environmental case concerns the operation of Merrimack Station, a coal-fueled

power plant on the Merrimack River in Bow, New Hampshire.  Since 1992, the Station has

operated under the same EPA-issued National Pollutant Discharge Elimination System permit

("1992 Permit"), which regulates the Station's discharge of pollutants into the Merrimack River.

In 2019, the plaintiffs, Sierra Club, Inc. and Conservation Law Foundation, Inc., filed a

complaint alleging that the owners of Merrimack Station violated three conditions in the 1992

Permit.  In 2020, the EPA issued a new permit ("2020 Permit") for Merrimack Station, and,

weeks later, the plaintiffs and the defendants filed petitions for review before the Environmental

Appeals Board ("EAB") contesting various conditions within the 2020 Permit.

The defendants Granite Shore Power LLC and GSP Merrimack LLC (collectively,

"Granite Shore")—the two remaining defendants in this case—have moved for summary

judgment on two bases.  First, they argue that the plaintiffs' claims are all moot because the 2020

Permit removes or replaces the portions of the 1992 Permit that formed the basis of the plaintiffs'

complaint.  Under the new conditions, the defendants argue, there is no possibility of continued

or future violations, so the issues raised in the complaint are no longer live.  The defendants also move for partial summary judgment on Count 5 of the complaint.  In Count 5, the plaintiffs allege that the defendants violated a reporting requirement within the 1992 Permit by failing to report all the continuous temperature and dissolved oxygen data they collected, providing statistical summaries instead.  The defendants argue that they have consistently complied with the reporting requirement, based on their indisputable interpretation of it.

The court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question).  The court denies both motions for summary judgment.  Mootness does not require summary judgment because the portions of the 1992 Permit featured in the plaintiffs' complaint remain in effect under EPA regulations until the parties' administrative appeals of the 2020 Permit are resolved.  Since the relevant 1992 Permit conditions are still in effect, the issuance of the 2020 Permit alone cannot moot the case.  The defendants have also failed to meet the burden for summary judgment on Count 5 of the complaint because genuine disputes of material fact remain as to the meaning of the reporting requirement and, thus, the defendants' record of compliance with it.

## I.  <u>Applicable legal standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party must "assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of

affecting the outcome of the case."  Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010) (internal quotation omitted).

Where, as here, the nonmovants—the plaintiffs—bear the ultimate burden of proof, once the movant has made the requisite showing, they can no longer "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute."  Torres–Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007).  That is, the plaintiffs "'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which [they] would bear the ultimate burden of proof at trial."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

As it is obligated to do in the summary judgment context, the court "rehearse[s] the facts in the light most favorable to the nonmoving party (here, the plaintiff[s]), consistent with record support," and gives them "the benefit of all reasonable inferences that those facts will bear."  Noviello v. City of Boston, 398 F.3d 76, 82 (1st Cir. 2005) (internal citation omitted).

## II.    **Background**

### a.    **Issuance of the 1992 and 2020 NPDES permits**

During operations, the Merrimack Station withdraws water from the Merrimack River and discharges heated water into a relatively shallow, impounded section of the river called the Hooksett Pool.  This discharge can affect the temperature of the Hooksett Pool and, thus, the health and survival of the marine life within the Pool.

The Clean Water Act grants the EPA the authority to issue National Pollutant Discharge Elimination System ("NPDES") permits to regulate the discharge of pollutants into the nation's

water.[1]  In 1992, the EPA issued an NPDES permit for Merrimack Station, which limits the

Station's thermal discharges and requires regular monitoring and reporting of, among other

things, the river water temperature and dissolved oxygen content.  The EPA issued the 1992

Permit to the then-owners of Merrimack Station, the Public Service Company of New

Hampshire.  The 1992 Permit was set to expire after five years, in 1997.  PSNH timely applied

for renewal, however, and the EPA administratively continued the 1992 Permit.[2]  Under EPA

regulations, permits that are administratively continued under these circumstances remain "fully

effective and enforceable."[3]  Years passed, and the 1992 Permit remained in effect.

In 2011, the EPA issued a draft of a new NPDES permit for Merrimack Station. In its

draft determinations for a new permit, the EPA noted that thermal discharge from Merrimack

Station had "caused, or contributed to, appreciable harm to Hooksett Pool's balanced, indigenous

community of fish."[4]  Public comment periods and revisions of the draft permit followed, and the

EPA extended its own estimate of the permit's final issuance date at least three times.[5]  In its

response to comments submitted during three public comment periods spanning from 2011 to

2017, the EPA attributed these delays in part to "factual and legal developments that altered

---

[1] 33 U.S.C. § 1342.

[2] Pls.' Opp'n (doc. no. 59-1) at 6; see also EPA -New England Clean Water Act NPDES permitting Determinations for the Thermal Discharge and Cooling Water Intake Structures at Merrimack Station in Bow, New Hampshire NPDES permit No. NH 0001465 (doc. no. 59-4) at i, 1 ("2011 Draft Filing").

[3] 40 C.F.R. § 122.6.

[4] 2011 Draft Filing (doc. no. 59-4) at 121.

[5] This court elaborated on the events occurring between the issuance of the draft permit in 2011 and the final permit in 2020 in a prior Order in this case.  See doc. no. 33 at 7-8.

development of the permit and took time to address."[6]  These developments included "EPA's revised understanding of thermal data evaluated for the 2011 Draft Permit[;] . . . new [thermal] data submitted since the 2011 Draft Permit[;] . . . [and] Merrimack Station's evolution from a 'baseload' facility that operated most of the time, to a facility that operates much less and more like a seasonal 'peaking' type of facility."[7]

While the revisions of the new permit continued, Granite Shore assumed ownership of Merrimack Station in January 2018.  At that point, the 1992 Permit was transferred to Granite Shore.

Finally, in May 2020, the EPA issued a final version of the new NPDES Permit for Merrimack Station, which would take effect in September 2020 and "supersede[]" the 1992 Permit.[8]  Roughly one month prior to the 2020 Permit's effective date, the defendants and the plaintiffs timely filed petitions for review before the EAB, with each party contesting different conditions in the 2020 Permit.[9]

A request for review of an NPDES permit has the initial effect of staying the new permit entirely.[10]  Following the submission of a request for review, the Regional Administrator determines and notifies the parties which of the new permit's provisions are (i) uncontested, (ii)

---

[6] EPA's Response to Comments (doc. no. 55-3) at I-4.

[7] EPA's Response to Comments (doc. no. 55-3) at I-7.

[8] See 2020 Final NPDES Permit (doc. no. 55-2) at PDF p. 1.

[9] See Petition for Review by Permittee GSP Merrimack LLC (doc. no. 59-3); Petition for Review by Sierra Club and Conservation Law Foundation (doc. no. 59-2).  Each party filed its petition for review under 40 C.F.R. §124.19.

[10] See 40 C.F.R. § 124.16(a).

contested, or (iii) uncontested but inseverable from contested conditions.[11]  Under EPA

regulations, the uncontested conditions "become fully effective enforceable obligations of the

permit" 30 days after the Regional Administrator's notification.[12]  The other two categories of

conditions remain "stayed . . . pending final agency action," and the permittee must continue to

comply with the corresponding conditions of the old permit.[13]

In this case, the Regional Administrator notified the parties of its determination regarding

contested conditions on September 1, 2020.[14]  Several of the 1992 Permit conditions, including

all of the conditions that feature in the plaintiffs' complaint, discussed below, have been deemed

contested and will remain in place throughout the appeals process, until there is a final agency

action.[15]

Final agency action occurs after a series of steps.  First, the relevant parties file responses

and replies to the petition for review; oral arguments may follow, under the EAB's discretion.[16]

Next, the EAB issues a decision within 60 (or if the EAB deems it appropriate) 120 days after

---

[11] 40 C.F.R. § 124.16(a)(2)(ii).

[12] 40 C.F.R. § 124.16(a)(2)(i).

[13] 40 C.F.R. § 124.16(a)(1), (c)(2).

[14] EPA Regional Administrator's Letter (doc. no. 62-1).

[15] See EPA Regional Administrator's Letter (doc. no. 62-1) at 3 ("As required by 40 C.F.R. § 124.16(c)(2), to the extent that conditions of the Permit are stayed, the Permittee must comply with the conditions of its existing permit (i.e., the 1992 Permit) that correspond to the stayed conditions listed above.  The 1992 Permit conditions that remain in effect are: Part I.A.1.b, Part I.A.1.c, Part I.A.1.f, Part I.A.1.g, Part I.A.4.f, Part I.A.11.a-b and Part I.A.13.").  The 1992 Permit conditions that the plaintiffs allege were violated by the defendants are all included in the Regional Administrator's list: Part I.A.1.b, Part I.A.1.g, and Part I.A.13.  See Pls.' Compl. (doc. no. 1).

[16] 40 C.F.R. § 124.19(b), (c), (h).

the later of the final briefing or oral argument.[17]  After the EAB reaches a decision on the merits or (if the decision includes a remand) after the remand proceedings are complete, the Regional Administrator must issue a "final permit decision."[18]  This marks the "final agency action."  The process can be extended by events including the EAB requiring that a final permit decision proceed only after appeal of a remand,[19] or the Regional Administrator's withdrawal of the permit or portions of it and introduction of a new permit.[20]

### b.   Current litigation

More than a year before the EPA issued the 2020 Permit, the plaintiffs filed this suit against the defendants, alleging violations of conditions in the 1992 Permit relating to discharge limitations and reporting requirements and seeking injunctive and declaratory relief as well as penalties.[21]

In Counts 1-3 of the complaint, the plaintiffs allege ongoing violations of each of the three elements of Part I.A.1.g of the 1992 Permit.  Part I.A.1.g sets forth the following narrative thermal discharge limitation: "The combined thermal plumes for the station shall (a) not block

---

[17] 40 C.F.R. § 124.19(l).

[18] 40 C.F.R. § 124.19(m)(2)

[19] 40 C.F.R. § 124.19(m)(2)(iii).

[20] The Regional Administrator could propose the withdrawal of the permit or portions of it and introduce a new permit—which would undergo public comment and an opportunity for public hearing—at any time during the pendency of the appeal.  The Regional Administrator could do so unilaterally within certain time limits or, after the time limits have passed, by requesting that the EAB grant a voluntary remand.  40 C.F.R. § 124.19(j).

[21] When the complaint was originally filed, Count 5 alleged violations by Granite Shore and PSNH, while Counts 1-4 only alleged violations by Granite Shore.  Pls.' Compl. (doc. no. 1) at 13-17.  On February 18, 2020, the parties entered into a stipulation dismissing PSNH from the suit with prejudice, leaving Granite Shore as the only defendants in the case.  Doc. no. 44.

zone of fish passage, (b) not change the balanced indigenous population of the receiving water, and (c) have minimal contact with the surrounding shorelines."

In Count 4, the plaintiffs allege ongoing violations of Part I.A.1.b of the 1992 Permit, which provides, "[t]he discharges shall not jeopardize any Class B use of the Merrimack River and shall not violate applicable water quality standards."

Finally, in Count 5 of the complaint, the plaintiffs allege ongoing violations by the defendants of the annual reporting requirements in Part 1.A.13 of the 1992 Permit: "[a]ll biological and hydrological monitoring program data shall be submitted to the NHDES, NHF&GD, USG&WS, and the Regional Administrator by December 31 of the following year." The plaintiffs allege that the defendants "collected continuous temperature and dissolved oxygen monitoring data and are in possession of such data, but have not reported such data to the agencies as required by [Paragraph 13] . . . ."[22]

Two months after the plaintiffs filed the complaint, in May 2019, the defendants filed a motion to dismiss for lack of Article III standing and issues related to the plaintiffs' pre-suit notice and the statute of limitations for citizen suits under the Clean Water Act.  At the same time, the defendants also filed a motion to stay the case based on considerations of judicial discretion, pending the EPA's issuance of a new or renewed NPDES permit.  The court denied the motion to dismiss, finding against the defendants on each issue.  The court also denied the motion to stay, in part because of the protracted nature of the EPA's process for finalizing a new permit.  The court declined to "impose a stay that would indefinitely delay consideration of the merits of the plaintiffs' claims."[23]  Months after the court made that decision, the EPA issued the

---

[22] Pls.' Compl. (doc. no. 1) at ¶ 97.

[23] Doc. no. 33 at 40.

2020 Permit, which, as described above, is currently under appeal before the EAB and stayed in part.

### III.       Analysis

#### a.     Mootness claim

The defendants move for summary judgment on all of the plaintiffs' claims on the basis that the 2020 Permit "removes" and "replace[s]" the 1992 Permit conditions at issue in the plaintiffs' complaint.[24]  The defendants' motion fails.  The case remains live because the relevant 1992 Permit conditions remain in effect under EPA regulations until the resolution of the appeal before the EAB and subsequent final agency action.

The mootness doctrine is founded in "a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed." Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 609 (2013).  "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." D.H.L. Assoc., Inc. v. O'Gorman, 199 F.3d 50, 54 (1st Cir.1999) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)).  But "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Knox v. Serv. Employees Int'l Union, Local 1000, 567 U.S. 298, 307-08 (2012) (quoting Ellis v. Railway Clerks, 466 U.S. 435, 442 (1984)).

The "core question" courts must consider is "whether . . . adjudication of the issue can grant meaningful relief." Conservation Law Found. v. Evans, 360 F.3d 21, 26 (1st Cir. 2004). "[I]f an event occurs while a case is pending . . . that makes it impossible for the court to grant

---

[24] Defs.' Mot. for Summ. J. (doc. no. 55-1) at 2.

any effectual relief whatever to a prevailing party, the [action] must be dismissed" as moot.

Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (internal citation omitted).

One intervening event that can render a case moot is a change in the rules (e.g., statute, regulation, permit) that form the basis of the controversy.  See Gulf of Me. Fisherman's All. v. Daley, 292 F.3d 84, 88 (1st Cir. 2002) (internal citation omitted) ("The promulgation of new regulations and amendment of old regulations are among such intervening events as can moot a challenge to the regulation in its original form.").  A change in rules can moot a case if "the change has removed any basis for a claim, or has fully satisfied the claim."  Charles Alan Wright, et al., 13C Fed. Prac. & Proc. Juris. § 3533.6 (3d ed.). "If relief remains useful, however, mootness can be avoided."  Id.

The defendants, as the moving party, carry the "heavy" burden of establishing mootness. Mangual v. Rotger-Sabat, 317 F.3d 45, 61 (1st Cir. 2003) (quoting United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953)).  The defendants argue that the issues in this case are no longer live because the complaint is based on conditions in the 1992 Permit which have changed or been eliminated under the 2020 Permit.  According to the defendants, the 2020 Permit supersedes the 1992 Permit and "does not contain any of the old provisions that the Plaintiffs have sued over."[25]  The defendants insist that "[t]he old provisions are gone," and they can no longer be violated as a matter of law.[26]  Further, there "is no reasonable prospect for future violations of the new provisions . . . ."[27]  The argument does not address the facts as they currently stand.

---

[25] Defs.' Mot. for Summ. J. (doc. no. 55-1) at 8.

[26] Defs.' Mot. for Summ. J. (doc. no. 55-1) at 8, 14.

[27] Defs.' Mot. for Summ. J. (doc. no. 55-1) at 15.

The defendants are correct that lawsuits based on the defendant's violations of a rule have been rendered moot by the enactment of a superseding rule with which the defendant complies. See, e.g., Fla. Ass'n of Rehab. Facilities, Inc. v. Dep't of Health & Rehab. Servs.—State of Fla., 526 F.3d 685, 690 (11th Cir. 2008) (affirming the district court's dismissal of a lawsuit as moot where "the basis for [the] lawsuit—the Boren Amendment—has been repealed, and defendants complied with Boren's successor statute before the district court entered final judgment on plaintiffs' Boren claim . . . ."); In re Nat'l Store Fixture Co., 769 F.2d 1334, 1335 (8th Cir. 1985) ("In view of the passage of the super[s]eding rule and the fact that [the challenged conduct] does not violate the new rule, the government conceded . . . that . . . the present appeal becomes moot.").

Mootness takes hold under this changing-rule principle, however, once the change has taken effect, and not beforehand.  The Supreme Court articulated this in Costle v. Pacific Legal Found., 445 U.S. 198 (1980), a case challenging the procedure applied by the EPA when extending the expiration date of an NPDES permit.  The Court explained that "[e]ven though the . . . NPDES permit . . . [has] expired . . . the terms of the permit, other than those aspects of the compliance schedule requiring completion after January 1, 1977, have remained in effect, both through the Court of Appeals' stay and by operation of law," and "[t]he case, therefore, clearly has not become moot."  Id. at 210.  The defendants also cite cases in which claims for relief were mooted upon the issuance of new rules that satisfied the claims, insisting that the cases involve "the specific factual scenario presented in this case . . . ."[28]  Consistent with Costle, in each of these cases, the new permit or rule that satisfied the plaintiffs' claims was in force at the time the decision was rendered.  That is not true here.

---

[28] Defs.' Mot. for Summ. J. (doc. no. 55-1) at 9.

Here, the 1992 Permit conditions at issue in the complaint have not been superseded or replaced by the 2020 Permit.  Instead, the EPA Regional Administrator has determined that the relevant 2020 Permit conditions are contested.  Under EPA regulations, the contested 2020 Permit conditions are stayed and the corresponding 1992 Permit conditions remain in effect until the appeal before the EAB is resolved and a final agency action occurs.[29]  The defendants conceded at oral argument that they do not know of a case in which mootness was found based on the issuance of a new permit that was stayed, as here.  The court does not know of such a case, either.  Since the 1992 Permit conditions pertinent to the plaintiffs' complaint remain in effect, the controversy surrounding these permit conditions cannot be considered moot.

In their Reply brief, the defendants argue that the appeal to the EAB (and the resulting stay of the relevant 2020 Permit conditions) does not prevent mootness for two reasons.  First, the defendants aver that the EAB appeal overcomes mootness only if the court assumes that the Regional Administrator will re-issue the 1992 Permit after the appeal, an assumption that is "speculative at best."[30]  This argument misstates the proper analysis under clear mootness principles.  The mootness doctrine focuses on the present, and even an imminent change in the facts central to a controversy does not necessarily render a case moot.  See Lewis v. BT Managers, Inc., 447 U.S. 27, 53 n.15 (1980) (noting in a case concerning the constitutionality of two Florida statutes that were to be repealed a month after the order was filed, and for which replacement bills were pending before the Florida Legislature, that "[a]s of the date this opinion is filed [the statutes at issue] remain in effect so the case has not become moot, whatever the ultimate disposition of the pending bills.").  The core question before the court is whether the

---

[29] See 40 C.F.R. § 124.16(a)(1),(c)(2)

[30] Defs.' Reply (doc. no. 60) at 8.

controversy is presently live.  The answer is yes because the relevant 1992 Permit conditions

remain in effect for <u>now</u>.  The court makes no assumptions about the outcome of the EAB appeal

that would render the case moot.

Second, the defendants assert that the plaintiffs' complaint is premised on the EPA's

assessment in 2011 that Merrimack Station's operations harm the environment of the Hooksett

Pool, but the EPA "has abandoned its prior 2011 analysis."[31]  For example, since 2011 the EPA,

in its own words, has "'determined that the thermal discharges associated with [the Station's]

operations are not currently causing appreciable harm to the BIP [balanced indigenous

population]' . . . ."[32]  As a result, according to the defendants, "the entire basis for [the

plaintiffs'] claims has 'become false' . . . ."[33]  The court rejects this argument, which seems to be

an attempt to argue for mootness based on voluntary cessation.  It is well-established that "the

standard . . . for determining whether a case has been mooted by the defendant's voluntary

conduct is stringent . . . ."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528

U.S. 167, 189 (1968).  To meet this standard, the defendants would need to show (i) they are no

longer violating the 1992 Permit as alleged; and (ii) it is "absolutely clear that [the alleged]

permit violations could not reasonably be expected to recur."  Id.  The defendants have not

established that the EPA's post-2011 analysis—including any potential findings that Merrimack

Station's discharges are not causing "current" harm to the BIP—leaves no genuine dispute of

material fact on these points.

---

[31] Defs.' Reply (doc. no. 60) at 8.

[32] Defs.' Mot. for Summ. J. (doc. no. 55-1) at 6 (quoting EPA's Response to Comments (doc. no. 55-3) at II-29).

[33] Defs.' Reply (doc. no. 60) at 8 (quoting Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 66 (1987)).

The defendants cite Friends of Merrymeeting Bay v. Topsham Hydro Partners Ltd., 2013 WL 145623 (D. Me. Jan. 14, 2013), to support their argument, but the case is not on point.  In Friends of Merrymeeting, the plaintiffs alleged that the defendant's hydroelectric dam violated the Endangered Species Act by "taking" endangered Atlantic salmon without an incidental take statement ("ITS").  Id. at *3.  An ITS both authorizes takings of an endangered species under specific terms and exempts the takings from liability under the ESA.  Id. at *2.  The Court determined that the plaintiffs' claims for injunctive and declaratory relief were moot after the National Marine Fisheries Service issued an ITS to the defendant.  Id. at *4.  As the Court explained, the ITS "fundamentally altered the circumstances of the litigation" because it authorized the actions that the plaintiffs challenged in their complaint as violations of the ESA and left "no grievance . . . for the Court to remedy."  Id. at *4-5.  Here, the defendants' alleged discharge and reporting violations have not been authorized by agency action or otherwise.  Even if the court assumed that the 2020 Permit had that effect, the relevant portions of the 2020 Permit have been stayed.  Friends of Merrymeeting fails to advance the defendants' argument.

The defendants also devote a considerable portion of their briefing to arguments for mootness under the premise that the 2020 Permit has taken effect and superseded the 1992 Permit, and the plaintiffs present counter-arguments.  But if the 2020 Permit were to take effect, the pertinent question for the court would be whether it could grant any effective relief, or if the 2020 Permit conditions satisfy the plaintiffs' claims for relief.  See Church of Scientology, 506 U.S. at 12.  The court need not decide this issue because, as discussed, the relevant 1992 Permit conditions, and not the corresponding 2020 Permit conditions, remain in effect.

While the mootness question is fully resolved by the ongoing partial stay of the 2020 Permit, as discussed above, the court does not ignore that the present situation is subject to

change, pending the outcome of the EAB appeal.  Thus, the court inquired during oral argument

about the practical benefit to the plaintiffs and the public of seeking relief while awaiting an

agency determination that could alter the final permit and possibly moot the case.  Plaintiffs'

counsel argued that, regardless of the result of the EAB appeal, the relief the plaintiffs seek

would be meaningful and the controversy would remain, in part because the current operations of

the Merrimack Station also violate the 2020 Permit.  For example, the plaintiffs point to in-river

temperature monitoring data that, according to the plaintiffs, shows that Merrimack Station's

thermal plumes caused the water temperature to exceed the 2020 Permit's daily-maximum

temperature limit at one monitoring station on multiple days in July 2019.[34]  This argument is not

legally relevant to the mootness question under the current facts, but it sheds light on the

prudence of pursuing this litigation at this time.

　　　The court denies the defendants' motion for summary judgment based on mootness and

turns to the defendants' motion for summary judgment on Count 5 of the complaint.

### b.　　　Partial summary judgment on Count 5 (reporting requirements)

　　　The defendants move for summary judgment on Count 5 of the complaint, in which the

plaintiffs allege that the defendants violated the 1992 Permit's reporting requirements at Part

I.A.13 ("Paragraph 13") by providing summaries of temperature and dissolved oxygen

monitoring data instead of the entirety of the continuous data the defendants collected.  The

dispute centers on the meaning of Paragraph 13.  The defendants argue that Paragraph 13 does

not require any specific interval or amount of data, but rather sets forth the frequency and

recipients of the data reports.  The defendants argue that summary judgment is proper because

they have complied with Paragraph 13, which they deem unambiguous, under their correct

---

[34] Pls.' Opp'n (doc. no. 59-1) at 17 (citing doc. no. 59-9).

interpretation.  The defendants have not satisfied their burden of showing that Paragraph 13's meaning is not subject to reasonable differences of opinion or inferences as to its meaning. Thus, summary judgment is not proper.

The parties agree that NPDES permits are interpreted as contracts.  Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., 268 F.3d 255, 269 (4th Cir. 2001).  Moreover, the 1992 Permit is a contract with the government, so its interpretation is governed by federal law.  See United States v. Seckinger, 397 U.S. 203, 209-10 (1970) (holding that federal law controls the interpretation of a contract between the government and a contractor because the contract was "entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution.").  Federal common law of contracts generally includes "the core principles of the common law of contract in force in most states."  United States v. Nat'l Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996).

Core contract interpretation principles require that "contracts containing unambiguous language must be construed according to their plain and natural meaning."  Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995).  Thus, the initial inquiry focuses on the plain language of the contract.  This plain language interpretation is a question of law. Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989).  In interpreting the plain language, "[w]here possible, words should be given their natural meaning, consistent with the tenor of contractual terms."  Id. at 1084 (internal citation omitted).  "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken."  Id. at 1083 (internal citations omitted).

If ambiguities remain after analyzing the plain language, "the ultimate resolution of [the meaning] typically will turn on the parties' intent." Smart, 70 F.3d at 178.  Inquiry into the parties' intent "often (but not always) involves marshalling facts extrinsic to the language of the contract documents." Id.  At this point, the inquiry "becomes a question of fact . . . rather than a question of law . . . ." Id. (quoting In re Newport Plaza Assocs., 985 F.2d 640, 645 (1st Cir. 1993)).  Therefore, "'an argument between parties about the meaning of a[n] [ambiguous] contract is typically an argument about a material fact,' and summary judgment is normally unwarranted unless 'the [extrinsic] evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide [to] the contrary.'" Den Norske Bank AS v. First Nat. Bank of Bos., 75 F.3d 49, 53 (1st Cir. 1996) (quoting Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992)).

Packaging these principles together, the First Circuit Court of Appeals has explained that "[s]ummary judgment based upon the construction of contract language is appropriate only if the meaning of the language is clear, considering all the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences which might reasonably be drawn from the language." Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 586 (1st Cir. 1993) (internal citations omitted).

### i.   Plain language

The court begins by determining whether the meaning of Paragraph 13 is unambiguous based on its plain language.  The parties present differing interpretations of the plain language of Paragraph 13.  Both are reasonable.  The court concludes that Paragraph 13 is ambiguous.

At the outset, the parties agree that Paragraph 13's reporting requirements apply to the data described in Paragraphs 11 and 12.  Paragraphs 11 and 12 require continuous monitoring of

river surface temperature and the pH and dissolved oxygen content of an "ambient river control station and the circulating water discharge."[35]  Paragraph 13 follows, requiring that "[a]ll biological and hydrological monitoring program data shall be submitted to the NHDES, NHF&GD, USF&WS, and the Regional Administrator by December 31 of the following year."[36]

The plaintiffs note that the two Paragraphs preceding Paragraph 13 require <u>continuous</u> monitoring of data, and they argue that the word "all" in Paragraph 13 modifies "data."  In other words, the plaintiffs argue, Paragraph 13 requires the defendants to report the entirety of the data they collect through the continuous monitoring called for in Paragraphs 11 and 12.  The plaintiffs support their interpretation by, for example, appealing to grammatical rules, which prescribe that the only noun that "all" can properly modify is "data," since the five words between "all" and "data" are modifiers.  The plaintiffs also point out that statistical summaries are explicitly requested in other reporting requirements within the 1992 Permit, so the absence of such a request in Paragraph 13 indicates a rejection of statistical summaries.  Other pertinent differences between Paragraph 13 and the Permit's other reporting requirements, according to the plaintiffs, include Paragraph 13's use of the word "submit" instead of "report" and "data" instead of "values."

The plaintiffs translate their interpretation of Paragraph 13 in concrete terms to mean that the data should be reported in the 15-minute intervals in which it is recorded.[37]  The defendants devote portions of their briefing to denying that Paragraph 13 requires the reporting of 15-minute interval data, noting at one point that "the Permit does not mention or reference 15-minute

---

[35] 1992 Permit (doc. no. 45-2) at PDF pp. 28-29.

[36] 1992 Permit (doc. no. 45-2) at PDF p. 29.

[37] <u>See, e.g.</u>, Pls.' Opp'n (doc. no. 50-1) at 1.

intervals" so "Plaintiffs' theory fails on its face."[38]  To the extent that the defendants are

implying that the plaintiffs' position fails (and summary judgment should be granted) unless

Paragraph 13 indisputably requires 15-minute interval reporting, they are incorrect.  As the

movants, the burden squarely rests on the defendants to assert the absence of a genuine issue of

material fact by showing that there can be no reasonable, differing interpretations of Paragraph

13 other than their interpretation.  Rodriguez-Abreu, 986 F.2d at 586.  In turn, the plaintiffs must

"provide specific facts showing that there is a genuine issue of material fact," Santiago-Ramos,

217 F.3d at 53.  The plaintiffs have done this by arguing against the reasonableness of the

defendants' interpretation of the plain language and providing extrinsic evidence that contradicts

that interpretation.

The defendants argue that the term "all" in Paragraph 13 modifies the term "program"

and refers to the categories of data that the defendants must report.  The defendants explain that

Paragraph 10 is entitled "Biological Monitoring Data," and Paragraphs 11 and 12 list types of

hydrological data, although those two paragraphs lack this title.  Paragraphs 10.b.2 and 11.a state

that biological impingement monitoring data and hydrological temperature monitoring data,

respectively, shall be reported according to Paragraph 13, but the remainder of the monitoring

requirements in Paragraphs 10, 11 and 12 leave the reporting process undefined.[39]  The

defendants assert that Paragraph 13 "fills this gap" by confirming that all categories of biological

and hydrological data listed in Paragraphs 10, 11, and 12 should be reported according to

Paragraph 13.  In this way, the defendants argue, Paragraph 13 is a "catch-all" provision that

---

[38] Defs.' Mot. for Summ. J. (doc. no. 45-1) at 12-13.

[39] See 1992 Permit (doc. no. 45-2) at PDF pp. 27-29.

identifies the frequency and recipients of the annual report on hydrological and biological monitoring data, but not the format or interval of the data itself.[40]

During oral argument, the court asked defense counsel if all categories of data listed in Paragraphs 10, 11, and 12 appear in the annual reports, as the presence of each category of data in the report would support the defendants' interpretation. Specifically, the court asked whether the pump entrainment monitoring data described in Paragraph 10.c is listed in the reports. Defense counsel first averred that the parties were not arguing over pump entrainment data, so this question was irrelevant. After further discussion, defense counsel agreed with the court that, under the defendants' interpretation, pump entrainment data should appear in the annual reports since it is a form of biological data listed in Paragraph 10. Ultimately, defense counsel could not confirm that this data appears in the reports. The defendants argue, however, that the language of Paragraph 13 supports their interpretation because it lists the recipients and frequency of the reports explicitly but does not clearly reference the interval at which the data should be reported. According to the defendants, the interval could have easily been referenced by, for example, adding terms like "continuous" or "collected" to modify the word "data."[41] The defendants also point to Part II.C of the 1992 Permit, entitled "Monitoring and Records," which provides that

---

[40] Defs.' Mot. for Summ. J. (doc. no. 45-1) at 7-8.

[41] The defendants also contend that the language of the 1985 Permit, which directly preceded the 1992 Permit, should be considered when interpreting the plain language of the 1992 Permit because it provides "context to the structure of the 1992 Permit and its plain meaning , , , ." Defs.' Reply (doc. no. 52) at 3. To the extent that contract-interpretation principles apply to NPDES permits, that is incorrect. A prior contract is extrinsic evidence and should not normally form part of the plain language analysis, and not under the circumstances present here. See, e.g., Sharp v. State Farm Fire & Cas. Ins. Co., 115 F.3d 1258, 1260-62 (5th Cir. 1997) (applying contract-interpretation principles to categorize a prior version of an insurance policy as extrinsic evidence of the meaning of the current insurance policy).

"[s]amples and measurements taken for the purpose of monitoring shall be representative of the volume and nature of discharge over the sampling and reporting period."[42]  The defendants conclude from this language that the monitoring data reported under Paragraph 13 should be representative of the data collected, and not the entirety of the data collected.[43]  The defendants argue that the statistical summaries provided in the annual reports meet this requirement.

Both of these interpretations are reasonable and plausibly supported by the broader language of Permit, and neither impermissibly or unreasonably stretches the natural meaning of the words.  The court is convinced that Paragraph 13 is susceptible to differing, reasonable interpretations, and the plain language analysis has not revealed an unambiguous meaning of Paragraph 13.  Fashion House, 892 F.2d at 1083.

**ii.  Intent**

The court must now turn its attention to the intent manifested by Paragraph 13, as argued by the parties through extrinsic evidence.  The parties' theories of intent raise genuine disputes of material fact. Thus, summary judgment is improper on this record.  The court describes below some of the competing extrinsic evidence pertaining to the 27-year course of performance under the 1992 Permit, to illustrate the parties' factual disputes regarding the intent behind Paragraph 13.

---

[42] Defs.' Mot. for Summ. J. (doc. no. 45-1) at 8 (quoting 1992 Permit Part II (doc. no. 62-2) at 8).

[43] The plaintiffs argue that the defendants have misread the plain language of this permit condition.  According to the plaintiffs, this condition focuses on the monitoring process, not reporting requirements, and it requires that "sampling or other monitoring must be conducted in a way that is representative of what is being sampled or monitored."  Pls.' Opp'n (doc. no. 50-1) at 9.  The defendants do not respond to this contention in their Reply, so the court assumed that the defendants abandoned this argument.  The defendants raised the argument again during oral argument.  Regardless of whether the defendants maintain this argument, it does not resolve the existing, material disputes of fact surrounding the meaning of the plain language of Paragraph 13.

The defendants describe a smooth and consistent course of performance in which the EPA consistently accepted their annual reports as compliant.  The defendants provide an affidavit from the current Executive Director of Administration and Regulatory Affairs at Granite Shore and former employee of PSNH, who asserts that, to her understanding, the EPA has never disputed the adequacy of the format or content of the annual reports submitted by the defendants or the identically formatted reports submitted by PSNH.[44]  The defendants also provide inspection reports from the New Hampshire Department of Environmental Services detailing its results from annual audits of Merrimack Station; in these reports, the defendants argue, the NHDES consistently certified Merrimack Station's compliance with Paragraph 13's reporting requirements.[45]  The defendants further note that the EPA included a temperature reporting requirement in the 2020 Permit that, in the EPA's words, "follow[s] the format from the 2018-2019" annual reports."[46]  They insist that this shows that the EPA believes that the annual reports comply with Paragraph 13's intent as expressed in its language.

The plaintiffs paint a picture of a blemished and inconclusive course of performance. The plaintiffs rebuff the NHDES letters as irrelevant to the intent behind the 1992 Permit because NHDES is not party to the 1992 Permit.[47]  The plaintiffs attribute the EPA's failure to

---

[44] Affidavit of Elizabeth H. Tillotson (doc. no. 45-3) at ¶¶ 2-3, 7-8.

[45] Doc. no. 45-5.  The defendants provide annual reports from NHDES spanning from 2000 to 2019, but the reports from 2004 and 2008 were not located.  See Affidavit of Elizabeth H. Tillotson (doc. no. 45-3) ¶ 9.

[46] 2020 Permit (doc. no. 55-2) at PDF p. 19.  This provision of the 2020 Permit is stayed under EPA regulations because it is contested, as discussed above.

[47] Specifically, the plaintiffs explain that the NHDES adopted the 1992 Permit as a state discharge permit, and the federal and state agencies independently administer their separate permits.  The plaintiffs point to Part I.C.2 of the 1992 Permit, which states that the 1992 Permit is issued by the EPA, and upon its issuance, the "Water Supply and Pollution Control Division may adopt [the] permit . . . as a state discharge permit pursuant to RSA 485A-13[,]" and the EPA

dispute the adequacy of the annual reports to, among other things, "bureaucratic inattention," as reflected in the EPA's decades-long delay in issuing a new NPDES permit, and the EPA's failure to evaluate the annual reports, which the plaintiffs infer from the EPA's assertions in its 2011 draft determinations for a new permit.[48]  In that document, the EPA states that instead of "verify[ing] that the target temperatures [in Hooksett Pool] were being achieved" the EPA "relied heavily on Merrimack Station's interpretation of its own data."[49]  As evidence that the annual reports fell short of what the EPA intended when drafting Paragraph 13, the plaintiffs also point to an occasion in 2015 when the EPA requested the water temperature data used to create the annual report summary statistics from three stations covering the periods from April to October, from 1984 to 2004.[50]  The EPA requested this information to support its "determination of final effluent limits for non-contact cooling water discharges from the Merrimack Station" in the final NPDES permit.[51]

The extrinsic evidence about the intent behind Paragraph 13 is not "so one-sided that no reasonable person could decide [to] the contrary."  Den Norske Bank, 75 F.3d at 53.  Thus, summary judgment is not appropriate on this record.

---

and state agency "each . . . shall have the independent right to enforce the terms and conditions of this permit."  1992 Permit (doc. no. 45-2) at PDF pp. 33-34.

[48] Pls.' Opp'n (doc. no. 50-1) at 23-24.

[49] 2011 Draft Filing (doc. no. 59-4) at 28.

[50] Doc no. 46 at 3.

[51] Doc no. 46 at 2.

**IV.**      <u>**Conclusion**</u>

For the foregoing reasons, the defendants do not merit summary judgment on mootness

or on Count 5 of the complaint.  Defendants' motions for summary judgment[52] are accordingly

DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: November 25, 2020

cc:      Edan Rotenberg, Esq.
         Reed Super, Esq.
         Daniel J. Mullen, Esq.
         Thomas F. Irwin, Esq.
         Wilbur A. Glahn, III, Esq.
         Jennifer L. Parent, Esq.
         P. Stephen Gidiere, III, Esq.
         Thomas G. DeLawrence, Esq.

---

[52] Doc. nos. 55 and 45.